15 CV 3975

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                               :

NATIONAL INDEMNITY COMPANY,    :    Case No. _____

                    Petitioner,    :

                              :    Hon. Naomi R. Buchwald

    - against -                :

IRB BRASIL RESSEGUROS S.A.,    :

                      :

                  Respondent.    :

                              :
------------------------------------------------------------x

RECEIVED
MAY 22 2015
U.S.D.C. S.D. N.Y.

## <u>PETITION TO CONFIRM THE ARBITRATION AWARD</u>

    Petitioner, National Indemnity Company ("NICO"), by and through its attorneys, Clyde

& Co US LLP, hereby petitions this Court for an order, pursuant to 9 U.S.C. §§ 9 and 207, (a)

confirming the final award issued on May 15, 2015 ("May 15 Final Award" or "Award")  by a

panel of three arbitrators in an arbitration ("Arbitration") brought against IRB Brasil Resseguros

S.A. ("IRB") by NICO; (b) entering a judgment upon such Award; and (c) granting such order

and further relief as the Court deems just and proper.

### The Parties and the Nature of the Arbitration

    1.      Petitioner NICO is a corporation duly organized under the laws of Nebraska, with

its principal place of business in Omaha, Nebraska.  NICO is an insurance company writing

direct insurance policies and reinsurance contracts covering risks in the United States and

internationally.

    2.      Respondent IRB is a foreign business corporation organized and existing under

the laws of the country of Brazil with its principal place of business in Rio de Janeiro, Brazil.

IRB writes reinsurance contracts covering direct insurance policies issued by insurance companies located in Brazil.

3.      This Arbitration involved, among other issues, IRB's right to coverage under two reinsurance agreements issued to it by NICO concerning property losses to a conveyor belt system located in Brazil and owned and operated by the Brazilian conglomerate Companhia Siderurgica Nacional ("CSN") (the "CSN Conveyor Belt Losses").

## Jurisdiction and Venue

4.      This Court has jurisdiction pursuant to 9 U.S.C. § 203 because this Petition and Final Award fall under Chapter 2 of the Federal Arbitration Act ("FAA"), §§ 201-208, which implements the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention").

5.      This Court has personal jurisdiction over NICO and IRB because (1) they agreed to have the Arbitration take place in New York, New York; and (2) the Arbitration was, in fact, conducted in New York, New York.

6.      Venue is proper under 9 U.S.C. §§ 9 and 204 because this Petition seeks confirmation of an arbitral award made within this District.

## Factual Background

7.      Reinsurance is an arrangement whereby an insurer (the reinsured or the ceding company) cedes or transfers all or part of the risk on an underlying insurance policy or group of policies to a reinsurer, which agrees to indemnify the ceding company for the risk transferred in exchange for receiving premium.  Reinsurers may, in turn, cede all or part of the risk they have agreed to reinsure to other reinsurers.  This type of arrangement is known as retrocessional coverage and the reinsurer ceding the risk and the reinsurer accepting the risk are referred to as, respectively, the retrocedent and the retrocessionaire.

8.      For the period of January 21, 2007 to November 21, 2007, Companhia Siderurgica Nacional ("CSN"), a steel, iron ore and mining conglomerate located in Brazil, purchased a direct insurance policy from Sul America Cia Nacional de Seguros ("Sul America"), a Brazilian insurance company (the "2007 CSN Policy").

9.      The 2007 CSN Policy was later extended from November 21, 2007 to February 21, 2008 (the "Extension Period"). Sul America reinsured almost the entire coverage provided under the 2007 CSN Policy with IRB. IRB, in turn, ceded a substantial portion of its reinsurance of the 2007 CSN Policy for the Extension Period to NICO under a retrocessional agreement (the "2007 Retrocessional Contract").

10.     The 2007 Retrocessional Contract consists of both a Certificate of Facultative Reinsurance (the "Certificate") and a Facultative Reinsurance Slip ("Slip"), which contain substantially the same terms and conditions.

11.     For the period of February 21, 2008 to February 21, 2009, CSN purchased a direct insurance policy from Mapfre Seguros, a Brazilian insurance company (the "2008 CSN Policy"). IRB reinsured the 2008 CSN Policy and ceded a substantial portion of its reinsurance of the 2008 CSN Policy to NICO under a retrocessional agreement (the "2008 Retrocessional Contract").

12.     The 2007 and 2008 Retrocessional Contracts contain arbitration clauses (the "Arbitration Agreements").

13.     In late 2008, NICO demanded arbitration against IRB under the 2007 and 2008 Retrocessional Contracts concerning, among other things, IRB's right to coverage under those contracts for property losses relating to a conveyor belt system owned and operated by CSN in Brazil (the "CSN Conveyor Belt Losses"). The parties proceeded with a consolidated arbitration under the 2007 and 2008 Retrocessional Contracts.

14.     The Arbitration was subject to a confidentiality order issued on April 26, 2012 by the Panel (the "Confidentiality Order").  As discussed below, this Confidentiality Order was subsequently modified twice by the Panel, in both instances at the request of NICO based upon the conduct of IRB and/or its counsel.  It was first modified on April 15, 2015 and thereafter by the Panel's May 15 Final Award, which withdrew the Confidentiality Order in its entirety, permitting NICO to submit all documents relating to the arbitration in any court, arbitral and other proceeding.  *See* Declaration of Michael A. Knoerzer in Support of Petition to Confirm at Ex. A. (hereinafter referred to as "Knoerzer Dec.").  Thus, the **arbitration documents are not confidential**.  *Id.*

15.     Both parties pursued extensive document and deposition discovery, and after a series of contested discovery and other issues, the arbitration proceeding ultimately culminated in an arbitration hearing at DLA Piper's offices in New York, New York from November 3, 2014 to November 12, 2014.  Both Parties submitted documentary evidence, witness testimony, and argument to the Panel concerning the issues in dispute.

16.     On January 15, 2015, after due deliberation, a Majority of the Panel issued a "Final Decision" (the "January 15 Final Award").  The Panel retained jurisdiction to determine other issues and issued its final decision with respect to those issues (the "April 15 Final Award").

17.     On April 16, 2015, despite having remained silent since the January 15 Final Award was issued, IRB's arbitrator, Mr. White, published a document labeled "Dissent," which he had putatively authored.  *See* Knoerzer Dec., Ex. B.  In the Dissent, Mr. White asserted for the first time that the Umpire of the arbitration Panel was biased in favor of NICO and that "the

legitimacy of the arbitral process require[d] **careful** scrutiny by the court." *Id.* at p. 1. (emphasis

in original).

18.     A day later, on April 17, 2015 at 10:04 a.m., the Majority wrote to express their

surprise at receiving a Dissent from Mr. White three months after the January 15, 2015

arbitration award was issued:

> i have just finished reading what purports to be mr. white's dissent,
> not only to the just issued april 2015 final decision and award
> regarding renewal, confidentiality, and fees/costs, but also to the
> january 2015 final decision regarding allocation, and a host of
> other panel decisions throughout this long arbitration.
>
> comparing the clearly written (although inaccurate) dissent with
> the manner in which mr. white has communicated within the panel
> over the past three years, i can only surmise that he was not the
> (sole) author.  if he was the author, i regret that mr. white decided
> to articulate his dissent in such a delayed fashion.
>
> *          *          *
>
> this unfortunate and entirely unexpected development of an
> inaccurate and ill-timed dissent (a dissent that calls into serious
> question whether outside agencies were involved) raises the
> question of whether this panel can and should function as a panel
> going forward, and i invite comment from counsel.

*See* Knoerzer Dec., Ex. C.

19.     By further statement dated April 25, 2015, the Majority of the arbitration Panel

amplified their concerns regarding the Dissent transmitted by Mr. White in light of the fact that

he had refused to confirm that he was the author of the Dissent or even to communicate about the

Dissent at all:

> TO:     Counsel for NICO and IRB
>
> I write on behalf of the two members of the arbitration panel (the
> "majority") that issued the January 15, 2015 Final Decision (Re:
> Allocation) and the April 15, 2015 Final Decision and Award (Re:

Renewal/Confidentiality and Fees/Costs) (collectively the "Final Decisions") in an arbitration between NICO and IRB.

The majority understands that one or more courts may have received a copy of a Dissent sent by the third arbitrator (James White) on April 16, 2015 to counsel for the parties. Mr. White sent this Dissent without any warning to the majority of the panel, and only after the Final Decisions had been fully deliberated and issued by the entire panel. As a consequence, the majority had no opportunity to respond to the Dissent.

Had the Dissent been limited to the merits of the April 15th Final Decision and Award, based on the record available to the parties, it would be a violation of the rules of this arbitration and standard arbitration practice, but the majority probably would not have found it necessary to respond to it in this fashion.

However, the Dissent applies to both Final Decisions and uses incomplete and distorted confidential panel communications as central support for its unfounded opinions of favoritism by the umpire and the majority toward one party. These disclosures represent serious breaches of panel confidentiality and could mislead any court that does not have the complete record to review.

Consequently, the majority believes that we have been forced by Mr. White to take steps designed to allow documented facts concerning the Dissent to be made available to any court that might give the Dissent consideration, in order to allow the court a basis to decide whether it should obtain a more complete record of confidential panel communications.

Since counsel do not (and should not) have the record of the confidential panel communications, the court would not have much if anything in the record available to place Mr. White's inaccurate and misleading rendition of panel communications in their complete and proper context.

*　　　*　　　*

As a courtesy, we will note for counsel just a few facts concerning Mr. White's Dissent.

1)   Mr. White did not request that the January 15th Final Decision note that he was registering a dissent, let alone writing one (three months later); all that was stated was that the Final

Decision was for the majority, which is understandable because Mr. White noted that he understood the basis for the majority's January 15th Final Decision, and that he found it well-reasoned.

2)    Regarding the April 15th Final Decision and Award, although Mr. White advised that a dissent should be noted on the majority's Final Decision and Award (and it was), he did not even hint that a written dissent of any kind would be provided before or after the April 15th Final Decision and Award was issued, let alone that such dissent would also attack the January 15th Final Decision, as well as the entire handling of the case.

3)  Contrary to the experiences of the majority in an aggregate of well over 600 arbitrations, Mr. White did not send the Dissent to the majority for review and comment.  In other words, Mr. White sent the Dissent to all parties without first allowing the majority an opportunity to consider its contents, point out and address errors, and adjust the majority's April 15th Decision and Award appropriately; the panel was also foreclosed from discussing with Mr. White his attacks on the Final Decision and the handling of the case from the start.

4)  Also contrary to the experiences of the majority, Mr. White seriously breached the confidentiality of panel deliberations by disclosing private panel communications in the Dissent.  Had the majority had the opportunity to review the Dissent prior to its release, it would have had an opportunity to deal with this breach and had Mr. White not been convinced to delete the snippets of confidential panel communication he misused, the majority would have been able to expose the full record of panel communications in the Final Decision and Award so that any reviewer would have the complete record to evaluate.

5)  Without providing any prior notice or explanation for doing so, Mr. White released the Dissent a full day after the April 15th Final Decision and Award (and three months after the January 15th Final Decision), even though he had ample opportunity to send the Dissent to the majority for the detailed analysis and considerations that every opinion of each panel member has received over the past three plus years.

The Dissent (a) was not part of either the January 15, 2015 Decision or the April 15, 2015 Decision and Award; (b) was not subject to review or comment by the other members of the panel; (c) breached the confidentiality of panel deliberations; and (d) was issued after the Final Decisions, using materially incomplete

confidential panel communications in an obvious and improper effort to support the efforts of IRB to reverse these decisions. No such dissent deserves to be credited or considered by anyone for any purpose.

The majority is confident that a review of the complete record would reveal that the snippets of confidential panel communications that Mr. White chose to expose in the Dissent are misleading and inaccurate and that the allegations of partiality are baseless. The entire record before the parties reveal that many significant decisions in this three plus year arbitration went "against" NICO and "for" IRB.

However, there is another serious concern (earlier expressed by me) that the Dissent may not have been developed and authored by Mr. White. Although NICO's counsel advised in apparent response to this concern that it believed the Dissent was just a parroting of IRB's positions, the majority have read Mr. White's communications in this and other arbitrations over many years – and after reading the Dissent, both of us independently and without any contact with each other reached the same opinion: that the dissent was nothing like anything Mr. White has written before in terms of style, reasoning, expression, syntax, or any other element of writing.

Given this, but recognizing that we are not experts, I asked Mr. White on Friday, April 17th, whether he and he alone developed and authored the Dissent. My concern was heightened when Mr. White refused to answer that simple question and advised on Sunday, April 19th, that he would not provide any further comment on the subject. Had Mr. White not developed and authored the Dissent alone, it can only mean that he (and perhaps others) seriously breached the confidentiality of the arbitration, as well as the confidentiality of panel communications and the procedural rules governing this arbitration generally, by utilizing the assistance of an undisclosed and unauthorized third party.

With the possibility that this matter, including this particular concern, will be dealt with in litigation, I advised all members of the panel on Friday, April 17th, to retain all writings in this arbitration (which should be done in any case) and to turn off any auto-delete features for emails and other e-documents, because these documents and related meta-data may be needed. Mr. Rosen responded appropriately, and I disclosed a glitch in the transfer of a massive amount of files a few years ago that appears to have eliminated some emails, but I believe that others will have copies.

- 8 -

Mr. White did not comment or otherwise respond to this request either.

It was this concern about Mr. White's Dissent, and this concern alone, that led me to ask counsel for their comments about the continuation of the panel's now quite limited jurisdiction. I thought that the issues involving Mr. White's Dissent went directly to the integrity of the arbitration process, and that both counsel probably would think they would be better handled by the courts, especially in light of that which remains for the panel might be called upon to decide. Had both parties advised or requested that our jurisdiction be terminated, I believe that the panel would have agreed to do so. However, I certainly did not suggest in my initial communication on this subject that our jurisdiction should be terminated, so there was nothing for IRB's counsel to "agree" to.

For the avoidance of doubt, the panel confirms that its retained jurisdiction remains unchanged, and that it expects compliance by the parties with the rulings set forth in the Final Decision and Award so that we may complete our charge.

Each member of the majority is willing to make available to the court(s) any and all of the detailed confidential communications among the three panelists, to respond under oath to any and all questions concerning this case, and to assist the court(s) in any other manner. Hence our continuing request that the parties provide the panel with contact information for any and all courts in which the Dissent has been submitted. Also, the majority requests that we be provided with the filings in any litigation where allegations are made regarding our service on this arbitration panel.

*See* Knoerzer Dec., Ex. D.

20.    Mr. White's reticence about his authorship of the Dissent caused NICO to write DLA Piper, by letter dated May 1, 2015, asking them to confirm that they were not involved in any way in preparing the Dissent. *See* Knoerzer Dec., Ex. E. NICO further put DLA Piper on notice that DLA Piper was to preserve all documents and phone records with Mr. White, on the ground that Mr. White may be called to testify before a federal judge about the provenance of the Dissent:

>We call your attention to the Majority's April 25, 2015 declaration which not only calls into question the provenance of the "Dissent" transmitted by IRB's party-appointed arbitrator, Mr. White, but reports that Mr. White has declined to confirm that the Dissent was his work product.
>
>Although you have not yet done so, we expect that IRB will refer to or rely upon the Dissent in support of its motion(s) to vacate the Majority's awards.[1]  Absent prompt confirmation of those Awards, the provenance of Mr. White's Dissent will plainly be a discoverable issue, subject to forensic computer inspection and telephone record searches, among other discovery.  No doubt, Mr. White would be called upon to testify before a federal judge to explain the view in the dissent and to confirm that he was the sole author of the Dissent.
>
>In this light, we ask that you confirm forthwith that no DLA Piper attorney, nor anyone acting in concert with a DLA Piper attorney, played any role in the development or drafting of the Dissent, or otherwise had any ex parte communications with Mr. White concerning the deliberations of the arbitration Panel or the preparation of the Dissent.  In any event, we request that DLA Piper retain all landline telephone, mobile telephone, and computer records of all attorneys and paralegals that have been involved in this matter commencing from January 1, 2015 until the date of the Dissent, April 16, 2015.

*Id.* Mr. White and the rest of the arbitration Panel were copied on this letter.  *See id.*

21.     Ten days passed without a word from Mr. White or DLA Piper.  Then, by letter of May 11, 2015, IRB's counsel confessed that the DLA Piper firm (no attorneys' names were specifically identified) did, in fact, breach the prohibition against ex parte communications with arbitrators and, after a "series" of communications with Mr. White, provided him with a "template draft" of the Dissent.  *See* Knoerzer Dec., Ex. F.

22.     IRB also copied the arbitrators on their letter to NICO's counsel.  By email dated May 12, 2015, the Umpire demanded on NICO:

---

[1]  By this time, DLA Piper had submitted the Dissent to this Court, but had not yet had an opportunity to refer to the Dissent in any briefing as no briefing was then due to be filed by IRB.

is nico bringing or planning to bring this serious violation to the
attention of all courts involved in this arbitration in the US and
Brazil, as well as the states that license the involved lawyers, and
the courts that have admitted them to practice?

*See* Knoerzer Dec., Ex. G.

23.     On May 13, 2015, NICO's counsel, having carefully reviewed New York's Rules

of Professional Conduct in light of the known facts, filed a Disciplinary Complaint against DLA

Piper with the Departmental Disciplinary Committee, Supreme Court, Appellate Division First

Judicial Department.

24.     On May 14, 2015 at 8:45 p.m., the Majority of the Panel issued a ruling which,

*inter alia*, withdrew any confidentiality order related to the arbitration:

> Given this, and in response to NICO's request based on the use by
> IRB of it in court proceedings, **the panel's Confidentiality Order
> is further modified to authorize the parties, counsel, and the
> panel members to use the Arbitration Information in any
> court, arbitral, or any other proceeding involving any of them.**

*See* Knoerzer Dec., Ex. H. (emphasis added).

25.     On May 15, 2015, the Panel issued the May 15 Final Award, which held as

follows:

> 1)     IRB is ordered to pay NICO the agreed amount of NICO's
> Fees and Costs of $2,524,486.40, with 9% interest accruing
> thereon from June 10, 2015 until paid.
>
> 2)     Within the next 7 days, IRB is ordered to turn over to
> NICO all written communications with Mr. White from January 1,
> 2015 thru 2pm eastern on May 15, 2015, and to detail all
> telephonic or in person communications with him by date,
> attendees, and subject matter during this period.
>
> 3)     The panel will entertain a request to order IRB to turn over
> to NICO all such communications prior to January 1, 2015.
>
> 4)     The panel will retain jurisdiction until further notice.

> 5)     Due to the contacts between IRB counsel and its arbitrator, the prohibition against *ex parte* communications is no longer applicable, as of 2pm eastern, May 15, 2015, for party appointed arbitrators Messrs. Rosen and White.

*See* Knoerzer Dec., Ex. I.

### Count I.  Confirmation Under the New York Convention

26.     Because the Arbitration Agreements and the May 15 Final Award are commercial in nature and involve a party from a country other than the United States, they are subject to the New York Convention.  9 U.S.C. § 202.

27.     Under the Convention, "any party to the arbitration may apply to any court having jurisdiction" for "an order confirming the award as against any other party to the arbitration."  9 U.S.C. § 207.  "The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  *Id.*

28.     No grounds exist for the Court to refuse or defer recognition or enforcement of the May 15 Final Award under the New York Convention.

29.     Accordingly, pursuant to 9 U.S.C. § 207, NICO is entitled to have the May 15 Final Award confirmed by this Court.

### Count II.  Confirmation Under the Federal Arbitration Act

30.     Section 9 of the FAA provides that "any party to the arbitration may apply to the court… for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title."  9 U.S.C. § 9.

31.     No grounds exist for the May 15 Final Award to be vacated, modified or corrected under Sections 10 or 11 of the FAA.

32.     Accordingly, NICO is entitled under the FAA to an order confirming the May 15 Final Award.

**WHEREFORE**, NICO, for the reasons stated in this Petition and in the accompanying Memorandum of Law and Declaration of Michael A. Knoerzer and exhibits, hereby respectfully applies to this Court for an order pursuant to 9 U.S.C. §§ 9 and 207:

(1) confirming the May 15 Final Award;

(2) entering a judgment upon such award; and

(3) granting such other relief as the Court may deem just and proper.

Dated:    May 22, 2015
          New York, New York

Respectfully submitted,
Clyde & Co US LLP

By: _____

Michael A. Knoerzer
michael.knoerzer@clydeco.us
Stephen M. Kennedy
stephen.kennedy@clydeco.us
Gregory S. Hoffnagle
gregory.hoffnagle@clydeco.us
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, New York 10174
Phone:  (212) 710-3900
Fax:  (212) 710-3950

*Attorneys for Petitioner*
*National Indemnity Company*