**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

NATIONAL INDEMNITY COMPANY,

                           Petitioner,

     - against -

IRB BRASIL RESSEGUROS S.A.,

                          Respondent.

----------------------------------------------------------------x

CIVIL ACTION NO. **15 CV 3975**

RECEIVED
MAY 22 2015
U.S.D.C. S.D. N.Y.

**DECLARATION OF MICHAEL A. KNOERZER IN SUPPORT OF**
**NATIONAL INDEMNITY COMPANY'S PETITION**
**TO CONFIRM ARBITRATION AWARD**

I, MICHAEL A. KNOERZER, declare pursuant to 28 U.S.C. § 1746 as follows:

     1.      I am a member of the bar of this Court and a partner in the law firm of Clyde & Co US LLP, attorneys for Petitioner National Indemnity Company ("NICO") in this action.  I submit this Declaration in Support of NICO's Petition to Confirm the Final Award issued on May 15, 2015 by the Majority of the Panel in an arbitration proceeding between NICO and IRB Brasil Resseguros S.A. ("IRB").

     2.      Annexed hereto as Exhibit A is a true and correct copy of the Arbitration Panel's order, dated May 15, 2015, modifying the April 26, 2012 Confidentiality Order.

     3.      Annexed hereto as Exhibit B is a true and correct copy of the document that arbitrator James P. White published as his dissent on April 16, 2015.

     4.      Annexed hereto as Exhibit C is a true and correct copy of an email by Umpire Daniel E. Schmidt, dated April 17, 2015.

5.      Annexed hereto as Exhibit D is true and correct copy of a letter written by Umpire Schmidt, dated April 25, 2015.

6.      Annexed hereto as Exhibit E is a true and correct copy of a letter from NICO's counsel to DLA Piper, dated May 1, 2015.

7.      Annexed hereto as Exhibit F is a true and correct copy of a letter from DLA Piper to NICO's counsel, dated May 11, 2015.

8.      Annexed hereto as Exhibit G is a true and correct copy of an email from Umpire Schmidt to NICO and IRB, dated May 12, 2015.

9.      Annexed hereto as Exhibit H is a true and correct copy of an email from Umpire Schmidt to NICO and IRB, dated May 14, 2015.

10.      Annexed hereto as Exhibit I is a true and correct copy of the Arbitration Panel's May 15, 2015 Final Award.

Dated:   May 22, 2015
         New York, New York

                                        Michael A. Knoerzer

# EXHIBIT A

In the Matter of an Arbitration

Between

NICO, Claimant            **Modification of Panel's April 26, 2012**
                                        **Confidentiality Order**

And

IRB, Respondent

At the request of NICO, and due to circumstances stated in the record involving IRB's counsel, DLA Piper, and its arbitrator, James P. White, a majority of the panel has found it necessary to further modify its Confidentiality Order by withdrawing it for the purposes of its use and application in any court, arbitral, and any other proceeding involving any of them.

BY A MAJORITY OF THE PANEL

Daniel E. Schmidt, IV
Umpire

Jonathan Rosen
Arbitrator

Dated: May 15, 2015

# EXHIBIT B

In the Matter of an Arbitration

        Between

National Indemnity Company ("NICO"),
                     Claimant,

        And                                       **DISSENT**

IRB Brazil Ressseguros, S.A. ("IRB"),
                     Respondent

I dissent.

I have been in the insurance industry for over 50 years. During that time, I served as Vice President and Assistant to the First Underwriter at North American Reinsurance Corporation, Executive Vice President, Director and COO of American Re-insurance Company, President and CEO of American Treaty Management Corporation, and President of the Reinsurance Consulting Group. I have been an arbitrator and Umpire in hundreds of reinsurance arbitrations and have overseen arbitrations during my career as a reinsurance executive. In all my experience, no other arbitration exhibited as much prejudice towards a party as this. From the beginning, this entire proceeding abused the fundamental principles of due process, fairness and the integrity of the arbitral process. As I will explain in detail in my dissent, the Umpire's decisions are not based on the facts, the law or the evidence. Rather, they are written to cloud their arbitrariness and to advance the interests of NICO at the considerable expense of IRB. The Umpire's decisions and the legitimacy of this arbitral process require **careful** scrutiny by the court.

**I.**     **Ruling that the Date of Loss IRB carried consistently was not correct and that IRB should have moved it to some unspecified earlier date that Umpire Schmidt failed to identify**

The evidence presented at the final hearing in this matter was unequivocal that the date of loss presented by CSN to its direct insurer Sul America was December 1, 2007. Thus, CSN tendered the loss in the Extension Period. There were witnesses and documents presented by IRB that confirmed this. There was not a single witness presented by NICO even on the subject matter and CSN in no way proved (as New York requires) that the loss occurred earlier than December 1, 2007 and that IRB's billing was wrong or unreasonable.

In addition, it was the unequivocal testimony of Sul America's witness (Mr. Mitke) that it handled the loss from inception to settlement in the Extension Period. Mr. Mitke was Sul America's Chief Claims Officer and his knowledge of the loss and the manner in which Sul America (IRB's cedent) handled and ceded the loss to IRB was impeccable and was not rebutted or disproved with evidence by NICO. He was a non-party witness whose testimony alone was enough to make IRB's allocation of the loss to the Extension reasonable. However, it addition to Mr. Mitke's testimony, he also presented screen shots of Sul America's claim file and other evidence, which established beyond

1

doubt that Sul America always carried the loss within the Extension. Mr. Mitke's testimony and the overwhelming evidence presented at the final hearing likewise confirm that Sul America ceded the loss to IRB, its reinsurer, in the Extension. These facts, unrebutted by NICO, mandated a finding of reinsurance coverage for IRB under New York law and industry custom and practice that is well understood by the Umpire.

Likewise, perfectly consistent with the foregoing, IRB's witness Mr. Marcelo confirmed that when the direct insurer, Sul America, put its reinsurer, IRB, on notice, the claim and loss was within the Extension Period. He also testified without equivocation that IRB, like Sul America, always carried the loss within the Extension Period. He further presented copies of the original folders for each of his claim files. Each of those confirmed that the loss was allocated to the Extension Period. Exs. 212A – 214B and 393A – 395B.

In addition, the presented screen shots from his computer showed how the loss was carried and, most notably, how it was paid. Each of those records shows that the loss was adjusted and paid as an Extension Period loss. Exs. 349 – 355. Mr. Marcelo also explained that IRB, as a reinsurer, had to follow its cedent, Sul America. Tr. 1126:17-22. There was no testimony to the contrary. There was no evidence presented to the contrary. There was only argument, speculation and innuendo submitted to a majority eager to support NICO. The Umpire's rejection of that evidence on the premise that IRB under Brazil law could choose the date of loss, was arbitrary and it, like so many of the majority's decisions, deprived IRB of its due process rights.

Further, when NICO was put on notice on September 29, 2008, the broker specifically informed NICO that the date of loss was December 1, 2007. Ex. 311. These facts and the compelling testimony by the broker were unrefuted by NICO.

New York law and reinsurance industry custom and practice give great weight to a cedent's, like IRB, decisions on the allocation of a loss. The law (which the Panel well understood) requires that a cedent's allocation decision be honored and followed. This well settled and well understood law and industry custom and practice mandate that the allocation decision be followed and paid provided it is reasonable. It is equally well understood that the bar to establish reasonableness is purposefully low and that reinsurers are precluded from obtaining *de novo* review of their cedent's coverage, settlement and allocation decisions. The cedent's allocation decision does not need to be right, just reasonable, and where there are multiple possible allocation scenarios available to a cedent, the law and industry custom allow the cedent to choose and require the reinsurer to follow.

IRB exceeded its burden of establishing a reasonable basis for its actions, its settlement and its allocation. The facts that were presented at the final hearing clearly demonstrated that there was a **reasonable** basis to allocate the loss to the Extension. Even an abbreviated look at the documents and evidence shows that Sul America (and its adjustors, lawyers, and experts), IRB (and its adjustors, lawyers, experts, and forensic accountants), the retrocessionaires (and their loss adjustors, lawyers, experts, and forensic accountants), the original period retrocessionaires and their lawyers, and CSN recognized December 1, 2007 as the date of loss (and that no better facts existed which justified changing that date). NICO on the other hand did not meet its heavy burden of proving that allocation of the loss to the Extension was in bad faith, fraudulent or constituted an *ex gracia* payment. It never came close to meeting, let alone exceeding, its burden under New York law.

Further, the undisputed testimony was that the Sul America policy required that the accident be manifest to trigger the coverage. The witnesses explained that this is how the policy is interpreted and operates in Brazil. In addition, the policy contained its own definition of sinistro. It was not an

unusual definition. Rather, it was one that was standardized in Brazil by government regulation. The policy defines sinistro as: "Sinistro [Loss]: The manifestation of the risk, the consequences of which are covered financially by the policy effected (all bodily injury and material damage resulting from one and the same event constitute one single loss for the purposes of cover and indemnity)." Ex. 344. In this regard, the evidence was unequivocal that the first manifestation of the loss that anyone could identify occurred during the Extension Period. NICO never proved otherwise. This was a maintenance record showing the first recording of such manifestation of the conveyer belt issue was within the Extension. Ex. 340A. The Umpire originally sought to preclude this evidence in favor of NICO but ultimately agreed to allow it. Tr. 1029 and 1184. In addition, the witness Mr. Veloso (an independent loss consultant who had no involvement in the insurance issues) testified unequivocally that the adjustment team could never connect any conveyer belt stoppages in the Original Period to the conveyer belt loss phenomenon. Tr. 1017:20 – 1022:25. They were all simply start up issues and maintenance. Tr. 1057:20 – 1058:3.

The evidence was unequivocally in favor of IRB. There was a wealth of reasonable bases for its allocation of the loss to the Extension Period (and request that NICO pay its share of loss adjustment expenses and loss payment). The Umpire, however, in a carefully calculated opinion worked around all that. He relied on Cooper Brothers International reports knowing full well that they were not written or even seen by Sul America or IRB until discovery in this arbitration. Rather, they were for the benefit of Extension Market retrocessionaires who sought unsuccessfully to move the loss out of their period. The Umpire also grasps for support in unauthenticated CSN pleadings, without giving any due to the fact that they are just pleadings ignoring those of Sul America and IRB.

The Umpire thus did precisely what he said he would not and could not do (and what New York law forbids him to do) – he wholly disregarded the follow the settlements agreement entered into by the parties. He conducted a *de novo* review of the underlying litigation and settlement for the purpose of allocating the loss elsewhere which protected NICO. And he then authored a decision that distorted the doctrine beyond all recognition and made purported "factual findings" which bare no relation to the evidence presented at the hearing. *See United States Fid. & Guar. Co. v. American Re-Ins. Co.*, 20 N.Y.3d 407 (2013).

Just as an example, the Umpire precluded IRB from presenting testimony from Sul America's lawyer Mr. Lyra (who was involved in the underlying adjustment, litigation and settlement). See October 3, 2014 CMO#12. This evidence was pertinent and material to the case. Likewise, the Umpire's striking of Mr. Penido's testimony was arbitrary, I believe, to favor NICO, since he allowed NICO's witness Mr. Snover to testify about alleged consultation with Mr. Penido when he was CSN's Chief Financial Officer. He relied upon a document that Mr. Penido allegedly prepared that was never authenticated. He rejected IRB's uncontroverted evidence that only the Extension Market was billed. He likewise barred Sul America's presentation of the loss to IRB and the retrocessionaires, yet allowed a portion of that very same presentation into evidence when requested by NICO (Ex.88.) He further barred the letter from Sul America's counsel, produced in discovery, which stated that the settlement was reasonable. The Umpire's "reasoning" for consistently ruling on every evidentiary issue in favor of NICO and against IRB was various, but biased, it had one known effect – it severely prejudiced IRB and deprived it of due process.

The Umpire, despite all his efforts to find otherwise, was unable to fix a date of loss other than December 1, 2007. The most he could come up with was to state that while the initial date of loss of December 1, 2007 was reasonable, subsequent "evidence" (and we have none) should have caused Sul America, which was not even a party to the arbitration, and thereby its reinsurer IRB to change the allocation of the loss from December 1, 2007 to somewhere within the 365 days in the Original

Period. But the Umpire himself fails to identify and to this day is unable to determine what the new date of loss should have been. He knows full well, as the evidence established, that the **only** date of loss ever identified throughout the loss adjustment and entire history of the claim was December 1, 2007. The majority's decision on the allocation issue is biased; it manifestly disregards the evidence and controlling law. The majority's decision not only deprived IRB of its due process rights but it left IRB with a $41M plus gap in the reinsurance program. A gap that was never intended, was unfair and without reason. The prejudice sustained by IRB is compelling and directly linked to a biased approach to this Arbitration.

II.     **Requiring IRB to Indemnify NICO for third party claims regarding premiums that IRB did not pay or receive, and that were not at issue in the Arbitration**

This Panel simply does not have any jurisdiction to effectuate an award requiring IRB to indemnify NICO regarding insurance policies that IRB is not a party to. In fact, the Brazil Court has already held that IRB is not on the risk for the Renewal program and the Panel therefore exceeded its authority, in concluding as it did. In addition, NICO also has already admitted that this Panel does not have the jurisdiction to fashion this type of remedy by suing IRB, CSN, and Catalyst Re Consulting in the United States District Court for the District of New Jersey regarding this very issue. This issue was not for this Umpire to decide, and in his effort to favor NICO, he exceeded his power and authority, reversed his own ruling in favor of NICO that the record was closed, and used supposition to replace result oriented reasoning.

The premium issue is yet another example of how the rules only worked one way in this case – against IRB. NICO never pled any claim for indemnity for claims for its premiums. NICO mentioned the issue on October 28, 2014 in its Pre-Hearing Statement of Position long after the close of all discovery. NICO put forward no case on the issue at the final hearing. There was not a single witness supporting NICO's position. IRB, of course, could put on no case on the point. NICO had refused to produce its underwriter witness. IRB had no underwriting witnesses because it did not know that NICO would later raise the point after the close of discovery on the eve of the hearing. Remember, discovery of documents, facts and experts was long closed when NICO first made this claim.

The only evidence that even touched on the point was the broker who admitted that CSN and not IRB paid the premiums to NICO (something NICO's own records established). NICO knew that IRB's position was that it was not on the risk for the Renewal. NICO knew, from the very beginning, in communications provided to its counsel that the Renewal litigation was going to address who was on the risk. NICO had full access to that court file. The Brazilian court (which actually had the parties to the issue present including CSN) originally ruled that IRB was on the risk as part of a preliminary injunction proceeding. However, once the Brazilian Court heard all of the evidence (which IRB was barred from presenting here due to the Umpire's post-final hearing decision to take on the issue), the Brazilian Court ruled that IRB was not on the risk. See Affidavit of Mr. Marcelo at Ex. T, U. The affidavit of Mr. Marcelo explains the litigation between CSN and IRB concerning the Renewal program in great detail. The Brazilian judgment cannot be questioned or challenged in this arbitration proceeding and yet the Umpire has concluded otherwise. The New Jersey Court on this issue would have greater competency and a superior record on which to reach a decision and at least a modicum of appreciation for the Brazilian Court's Final Ruling which the Umpire completely disregarded.

At the urging from counsel for NICO, the Umpire closed the final hearing and declared on November 12, 2014 that the record was closed. "(Hearing Tr. p. 1734 ("Mr. Knoerzer: 'I would like

4

it closed, subject to that, please.'" (Subject to the translation of a miscopied document being discussed); Hearing Tr. at p. 1735 ("The Umpire: 'All right. So with that qualification, the record is closed, with the exception of that translation, if there's something to translate."). He was not true to his word. On January 31, 2014, NICO requested to reopen the case based upon new "developments". The purported new development that was not in the record was that CSN had chosen to sue numerous parties in Brazil to recover the premium. What followed was a violation of due process. Over IRB's objections, on February 14, 2015 Umpire Schmidt chose to reopen the case and to seize jurisdiction over the matter.  He did so to put "pressure on IRB" although: (1) the matter involved Brazil law; (2) the parties at issue were involved in a Brazil litigation and not present in the arbitration; (3) NICO had commenced a New Jersey action on the issue, and (4) IRB could not put on witnesses or take discovery because the so-called final hearing was over and all discovery had closed five months prior. Umpire Schmidt thus reversed his own ruling (when asked by NICO which then had changed its mind about a closed record) and on a completely broken record chose to conclude the exact opposite of what the Brazil court had already said in a **final decision** and order. Instead, his ruling relies on the injunction the Brazilian Court temporarily imposed on April 3, 2008. He did so to IRB's prejudice. As the Umpire wrote in a March 22nd email to the Panel, he had hoped that by threatening, he would "pressure" IRB into reaching some form of settlement with CSN and NICO which in his opinion would save both, litigation expenses. I assumed it would also save NICO from the obligation to convince a Court either in New Jersey or Brazil of the appropriateness of its case as well as saving them further litigation expenses. The award fashioned by the majority is the result of manifest bias against IRB and undeserved favoritism towards NICO. The majority completely deprived IRB of all notions of due process and further polluted the arbitral process. This award has no basis in fact, evidence or law and should be carefully scrutinized by the courts.

### III.   Ordering IRB to pay NICO's Attorney's Fees despite the Contract Language, the American Rule and his own prior representations

The Umpire knew full well that the Certificate he was relying on specifically states that each party is to bear its own costs. The arbitration agreement states that "Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expenses of the third arbitrator and of the arbitration." Ex. 233 at p. 10.

The Umpire also knew that the Certificate / Slip stated that New York law applied, and that, New York follows the American Rule. Fees quite simply are not awarded even to the winning party. In fact, under New York law, costs should only be awarded to a party when the other party is found to have engaged in malicious and intentional conduct – conduct that neither NICO nor the Panel has shown IRB to have committed.

Even if the standard was whether one party or another was unreasonable, that standard would patently mean that NICO (and not IRB) should pay costs. The evidence established that NICO failed to conduct a reasonable investigation into the loss, made an abrupt decision to deny cover for the loss within 43 minutes of notice, commenced multiple arbitrations against IRB regarding a loss that had not yet been ceded, and employed overly aggressive and unwarranted tactics by taking constantly shifting positions while filing multiple motions even though the Panel ordered otherwise. We all know that NICO filed this arbitration prematurely and without substance, and then proceeded to hopscotch from one made up defense to another throughout the years, all with the Umpire's oversight. Clearly he was reluctant to surrender jurisdiction over an unresolved potential loss, instead moving forward with "baby steps" (his term) a most favorable approach to NICO and completely disadvantageous to IRB. Remember, although the Umpire now chooses to forget, that NICO began this case as a rescission case claiming that it was entitled to rescind because IRB had

made some misrepresentation. NICO forced IRB to produce a mountain of records and incur unreasonable costs on the basis that NICO never would have signed onto the risk had it known of the R3 collapse. NICO knew all along about the R3 loss from a January 2008 Roadshow document from the broker that disclosed the R3 loss to NICO. Ex. 2. So NICO knew about the R3 loss, but kept IRB running in circles for years with massive discovery and an arbitration that was not ripe. The Umpire allowed NICO to do so at the very time when IRB and its small team was litigating a billion dollar dispute with CSN in Brazil and was taking reasonable steps (extraordinary steps) to protect its reinsurers including NICO. NICO's conduct here and the Umpire's decisions when the arbitration was not ripe are, at best, questionable. As is now clear, the Umpire then allowed NICO to drop the entire rescission point without comment. There were many other examples of such misconduct by NICO that was devoid of negative comment from the Umpire.  NICO's complete misstatement of IRB's position in the London Arbitration and their hiding the Cooper Brothers local report (that showed NICO knew the date of notice and the date of loss from the beginning). This is the period the Umpire states was a "wash" for costs because they were either offsetting or immaterial. They certainly are material and there is no case for offsetting. The Umpire casually refers to these serious violations by NICO as "allegations". **Why**?

NICO never had a viable claim against IRB for costs. Throughout the matter IRB was entirely on the defensive. It was trying to resolve a massive loss and litigation against it in Brazil (which resulted in a $168 million settlement payment) without any support from NICO (which had denied coverage and commenced arbitration against it). Even the Umpire admitted this. In the Umpire's draft award dated December 22, 2014 that he provided to the Panel he stated that he was not going to award costs. How could he later determine that the actions subsequent to the March 11, 2014 bill were so egregious as to warrant costs but those that preceded were immaterial? At this point in December, his reasoning was fully developed and no additional facts would come to his attention and yet he not only completely reverses his opinion but then elects to impose costs on IRB for the post payment period while dismissing IRB's valid supported claims. His abbreviated ruling on this phase is in stark contrast to his earlier allocation presentation. Is it due to this reversal without support, on costs and his supposition and distorted opinion on indemnity? The Umpire chose to mark his first decision as "Final" when it was not, and to wait 90 days before issuing further rulings against IRB, to IRB's prejudice. Furthermore, by ruling in favor of NICO on Indemnity, he has removed all incentive for NICO to prevail in the New Jersey Court action or in Brazil (a country that NICO has chosen as a desirable place to pursue and provide insurance).  He suggested that this most likely probability never "entered his mind" which contrasts with the extensive legal experience of the majority, specifically stated and included as a part of the earlier decision. When so advised this did not cause him pause to reconsider his decision to move ahead with, at best, an inadequate record; despite knowing the Courts would provide a more competent venue for a proper hearing and final ruling.

## IV.    Modifying the Panel's Confidentiality Order

After extensive argument by both parties, on April 26, 2012, the Panel ordered that this arbitration proceeding is confidential based on the ARIAS US form. To now modify that order would be highly prejudicial to all parties. In fact, in all my years as an arbitrator I have never seen a situation where good cause has been shown to warrant modification of a confidentiality order. Here, the majority's decision to modify the confidentiality order to allow NICO to use confidential material and testimony in court proceedings would be highly prejudicial to not only IRB, but NICO as well. Voluminous material and testimony was presented to the Panel on the understanding that the arbitration was confidential.

/s/_James P White                                              James P. White, Arbitrator

# EXHIBIT C

| From: | Daniel Schmidt, IV |
|---|---|
| To: | Knoerzer, Michael; Robert.Santoro@dlapiper.com; Kennedy, Stephen; Romano, Tessa; Aidan.McCormack@dlapiper.com; michael.murphy@dlapiper.com |
| Cc: | JONROSEN55@aol.com; Jim White |
| Subject: | Re: In the Matter of the Arbitration Between National Indemnity Company and I... |
| Date: | Friday, April 17, 2015 10:04:13 AM |

i have just finished reading what purports to be mr. white's dissent, not only to the just issued april 2015 final decision and award regarding renewal, confidentiality, and fees/costs, but also to the january 2015 final decision regarding allocation, and a host of other panel decisions throughout this long arbitration.

comparing the clearly written (although inaccurate) dissent with the manner in which mr. white has communicated within the panel over the past three years, i can only surmise that he was not the (sole) author.  if he was the author, i regret that mr. white decided to articulate his dissent in such a delayed fashion.

however, whether or not he was the author, mr. white's failure to express and deliberate these views within the panel, his litany of inaccurate and out-of-context characterizations of the panel's confidential communications, the fact that this dissent was not issued as part of a panel decision, and the fact that he materially breached the confidentiality of panel communications means that it should not be credited or even considered, at least not without the rest of the panel having an opportunity to correct a distorted rendition of the record, something that the timing of this dissent kept the majority from doing in the normal course of panel deliberations.

mr. white and many others know that i have always supported the position that a panel member should be free to dissent on grounds that relate to statutory challenges, but that such dissent needs to be part of a process that allows the entire panel to participate, which in turn helps to protect the record and the integrity of the process.  mr. white failed to act in a professional manner and opted instead to operate outside of and thereby undermine the panel's deliberative process.

the complete record of thousands of panel communications would show that throughout this case each issue was decided after a thorough review and that each member of the panel had ample opportunity to share views and comment on the other positions in an effort to reach a fair and reasonable decision.

this unfortunate and entirely unexpected development of an inaccurate and ill-timed dissent (a dissent that calls into serious question whether outside agencies were involved) raises the question of whether this panel can and should function as a panel going forward, and i invite comment from counsel.

dan schmidt, iv
umpire


Dan Schmidt IV

(winter address - oct to jun)
40933 north 97th street
scottsdale, az 85262

732-614-1366 (cell)
dan@des4adr.com
www.des4adr.com

On Apr 17, 2015, at 12:31 AM, "Daniel Schmidt, IV" <dan@des4adr.com> wrote:

> i have not read mr. white's dissent to the just issued decision and award, but he did not advise the rest of the panel of any intent to write one, and he did not share his thinking with the other members of the panel as they have always done with him before anything was released.  in other words, mr. white did not expose his written dissent to analysis and response by the rest of the panel, and the majority's decision and award therefore could not include any responses to this dissent.

> had he advised he planned to write a dissent to the decision and award, i would have asked him to provide the other members of the panel with his dissent, as he was provided with every draft and modification with detailed explanations for what became a majority decision and award.

after i read it, further communications might be in order.  i hope that mr. white has maintained the confidentiality of panel deliberations in his dissent.

mr. white's action was a completely unexpected development, and i regret that he decided to send something out without notice and without first subjecting it to analysis by other members of the panel.

as far as i am concerned, since he operated outside the panel's (and standard arbitration) protocol, mr. white's dissent is not a legitimate part of the decision and award.  it was not reviewed by the panel, and it was not issued with the panel's majority decision and award.

dan schmidt, iv
umpire


Dan Schmidt IV

(winter address - oct to jun)
40933 north 97th street
scottsdale, az 85262

732-614-1366 (cell)
dan@des4adr.com
www.des4adr.com

On Apr 16, 2015, at 11:49 PM, "Jim White" <jpwhite123@aol.com> wrote:


    FYI

James P White
Reinsurance Consulting & Arbitration Services
Two Grace Court
Greenlawn NY 11740-1116
631 757 2423
jpwhite123@aol.com

    -----Original Message-----
    From: Daniel Schmidt, IV <dan@des4adr.com>
    To: Michael.Knoerzer <Michael.Knoerzer@clydeco.us>; michael.murphy
    <michael.murphy@dlapiper.com>; Aidan.McCormack <Aidan.McCormack@dlapiper.com>;
    Robert.Santoro <Robert.Santoro@dlapiper.com>; Stephen.Kennedy
    <Stephen.Kennedy@clydeco.us>; Tessa.Romano <Tessa.Romano@clydeco.us>
    Cc: jpwhite123 <jpwhite123@aol.com>; JONROSEN55 <JONROSEN55@aol.com>; Daniel Schmidt,
    IV <dan@des4adr.com>
    Sent: Thu, Apr 16, 2015 5:46 pm
    Subject: Re: In the Matter of the Arbitration Between National Indemnity Company and I...

    My scan feature is not working, so I added my signature above jonathan's and faxed the page to michael
    knoerzer at Clyde & Co's fax number, 212-710-3950.

    Please provide IRB counsel a copy.

    Thank you,

    Dan

    Dan Schmidt, IV
    dan@des4adr.com
    732-614-1366
    www.des4adr.com

(winter address — oct to oct)
Saguaro Forest/Desert Mountain
40933 North 97th Street
Scottsdale, AZ 85262

(summer address — jun to oct)
Alderbrook
13 Country Lane
Little Silver, NJ 07739

---

**From:** Jonathan Rosen < jonrosen55@aol.com>
**Date:** Thursday, April 16, 2015 at 5:18 PM
**To:** Michael Knoerzer < Michael.Knoerzer@clydeco.us>, Daniel Schmidt < dan@des4adr.com>, "
michael.murphy@dlapiper.com" < michael.murphy@dlapiper.com>, "
Aidan.McCormack@dlapiper.com" < Aidan.McCormack@dlapiper.com>, "
Robert.Santoro@dlapiper.com" < Robert.Santoro@dlapiper.com>, "
Stephen.Kennedy@clydeco.us" < Stephen.Kennedy@clydeco.us>, " Tessa.Romano@clydeco.us" <
Tessa.Romano@clydeco.us>
**Cc:** " jpwhite123@aol.com" < jpwhite123@aol.com>
**Subject:** Re: In the Matter of the Arbitration Between National Indemnity Company and I...

Mike, please see attached.
Regards,

Jonathan

Jonathan Rosen
Arbitration, Mediation and Expert Witness Services
1133 Broadway, Suite 600
New York, NY 10010
(646) 330 5128 (W)
(917) 628 2645 (Cell)
jonrosen55@aol.com
In a message dated 4/16/2015 5:02:21 P.M. Eastern Daylight Time, Michael.Knoerzer@clydeco.us writes:

> Gentlemen,
>
> We would be grateful if at least the Majority were to execute the award and pdf to
> us. I think it is okay for the pdfs to be in counterparts.
>
> Kind regards,
>
> Mike
>
> **Michael Knoerzer**
> Partner | Clyde & Co US LLP
> **Direct Dial:** +1 212 710 3940 | **Mobile:** +1 347 602 0811
>
> The Chrysler Building | 405 Lexington Avenue | 16th Floor | New York | NY 10174 | USA
> **Main** +1 212 710 3900 | **Fax** +1 212 710 3950 | **www.clydeco.us**
>
> **From:** Daniel Schmidt, IV [mailto:dan@des4adr.com]
> **Sent:** Wednesday, April 15, 2015 11:47 PM
> **To:** michael.murphy@dlapiper.com; Aidan.McCormack@dlapiper.com;
> Robert.Santoro@dlapiper.com; Knoerzer, Michael; Kennedy, Stephen; Romano, Tessa
> **Cc:** jpwhite123@aol.com; jonrosen55@aol.com; Daniel Schmidt, IV
> **Subject:** Re: In the Matter of the Arbitration Between National Indemnity Company and IRB
> Brasil Resseguros S.A. -- Final Decision and Award (Re: Renewal/Confidentiality and
> Fees/Costs)
> **Importance:** High
>
> Dear counsel — the final decision regarding the outstanding issues is attached.
>
> Please note that the panel has retained jurisdiction regarding the award of fees/costs.

Please provide instructions to the panel regarding the execution of this Decision and Award.

Thank you,

Dan Schmidt, IV
Umpire


Dan Schmidt, IV
dan@des4adr.com
732-614-1366
www.des4adr.com

(winter address — oct to oct)
Saguaro Forest/Desert Mountain
40933 North 97th Street
Scottsdale, AZ 85262

(summer address — jun to oct)
Alderbrook
13 Country Lane
Little Silver, NJ 07739

_____

ALERT: Do international trade sanctions affect your business? http://sanctions.clydeco.com

This email message and any attachments may contain legally privileged and/or confidential information intended solely for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution or copying of this message or its attachments is strictly prohibited. If you have received this email message in error, please immediately notify us by telephone, fax or email and delete the message and all attachments thereto. Thank you. Clyde & Co US LLP is a Delaware limited liability law partnership affiliated with Clyde & Co LLP, a multinational partnership regulated by The Law Society of England and Wales.

Disclosure: To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that any tax advice contained in this communication (including any attachment that does not explicitly state otherwise) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing or recommending to another party any transaction or matter addressed herein.


<DISSENT.rtf>

# EXHIBIT D

April 25, 2015

TO:  Counsel for NICO and IRB

I write on behalf of the two members of the arbitration panel (the "majority") that issued the January 15, 2015 Final Decision (Re:  Allocation) and the April 15, 2015 Final Decision and Award (Re:  Renewal/Confidentiality and Fees/Costs) (collectively the "Final Decisions") in an arbitration between NICO and IRB.

The majority understands that one or more courts may have received a copy of a Dissent sent by the third arbitrator (James White) on April 16, 2015 to counsel for the parties.  Mr. White sent this Dissent without any warning to the majority of the panel, and only after the Final Decisions had been fully deliberated and issued by the entire panel.  As a consequence, the majority had no opportunity to respond to the Dissent.

Had the Dissent been limited to the merits of the April 15th Final Decision and Award, based on the record available to the parties, it would be a violation of the rules of this arbitration and standard arbitration practice, but the majority probably would not have found it necessary to respond to it in this fashion.

However, the Dissent applies to both Final Decisions and uses incomplete and distorted confidential panel communications as central support for its unfounded opinions of favoritism by the umpire and the majority toward one party.  These disclosures represent serious breaches of panel confidentiality and could mislead any court that does not have the complete record to review.

Consequently, the majority believes that we have been forced by Mr. White to take steps designed to allow documented facts concerning the Dissent to be made available to any court that might give the Dissent consideration, in order to allow the court a basis to decide whether it should obtain a more complete record of confidential panel communications.

Since counsel do not (and should not) have the record of the confidential panel communications, the court would not have much if anything in the record available to place Mr. White's inaccurate and misleading rendition of panel communications in their complete and proper context.

Given this, the majority requests that counsel provide the contact information for each court that has been provided the Dissent.  The majority plans to send a letter that offers the court any input or assistance we might be able to provide relating to the Dissent, since only the panel has the facts that would place such Dissent in its appropriate context.

As a courtesy, we will note for counsel just a few facts concerning Mr. White's Dissent.

1

1) Mr. White did not request that the January 15th Final Decision note that he was registering a dissent, let alone writing one (three months later); all that was stated was that the Final Decision was for the majority, which is understandable because Mr. White noted that he understood the basis for the majority's January 15th Final Decision, and that he found it well-reasoned.

2) Regarding the April 15th Final Decision and Award, although Mr. White advised that a dissent should be noted on the majority's Final Decision and Award (and it was), he did not even hint that a written dissent of any kind would be provided before or after the April 15th Final Decision and Award was issued, let alone that such dissent would also attack the January 15th Final Decision, as well as the entire handling of the case.

3) Contrary to the experiences of the majority in an aggregate of well over 600 arbitrations, Mr. White did not send the Dissent to the majority for review and comment. In other words, Mr. White sent the Dissent to all parties without first allowing the majority an opportunity to consider its contents, point out and address errors, and adjust the majority's April 15th Decision and Award appropriately; the panel was also foreclosed from discussing with Mr. White his attacks on the Final Decision and the handling of the case from the start.

4) Also contrary to the experiences of the majority, Mr. White seriously breached the confidentiality of panel deliberations by disclosing private panel communications in the Dissent. Had the majority had the opportunity to review the Dissent prior to its release, it would have had an opportunity to deal with this breach and had Mr. White not been convinced to delete the snippets of confidential panel communication he misused, the majority would have been able to expose the full record of panel communications in the Final Decision and Award so that any reviewer would have the complete record to evaluate.

5) Without providing any prior notice or explanation for doing so, Mr. White released the Dissent a full day after the April 15th Final Decision and Award (and three months after the January 15th Final Decision), even though he had ample opportunity to send the Dissent to the majority for the detailed analysis and considerations that every opinion of each panel member has received over the past three plus years.

The Dissent (a) was not part of either the January 15, 2015 Decision or the April 15, 2015 Decision and Award; (b) was not subject to review or comment by the other members of the panel; (c) breached the confidentiality of panel deliberations; and (d) was issued after the Final Decisions, using materially incomplete confidential panel communications in an obvious and improper effort to support the efforts of IRB to reverse these decisions. No such dissent deserves to be credited or considered by anyone for any purpose.

2

The majority is confident that a review of the complete record would reveal that the snippets of confidential panel communications that Mr. White chose to expose in the Dissent are misleading and inaccurate and that the allegations of partiality are baseless. The entire record before the parties reveal that many significant decisions in this three plus year arbitration went "against" NICO and "for" IRB.

However, there is another serious concern (earlier expressed by me) that the Dissent may not have been developed and authored by Mr. White. Although NICO's counsel advised in apparent response to this concern that it believed the Dissent was just a parroting of IRB's positions, the majority have read Mr. White's communications in this and other arbitrations over many years – and after reading the Dissent, both of us independently and without any contact with each other reached the same opinion: that the dissent was nothing like anything Mr. White has written before in terms of style, reasoning, expression, syntax, or any other element of writing.

Given this, but recognizing that we are not experts, I asked Mr. White on Friday, April 17th, whether he and he alone developed and authored the Dissent. My concern was heightened when Mr. White refused to answer that simple question and advised on Sunday, April 19th, that he would not provide any further comment on the subject. Had Mr. White not developed and authored the Dissent alone, it can only mean that he (and perhaps others) seriously breached the confidentiality of the arbitration, as well as the confidentiality of panel communications and the procedural rules governing this arbitration generally, by utilizing the assistance of an undisclosed and unauthorized third party.

With the possibility that this matter, including this particular concern, will be dealt with in litigation, I advised all members of the panel on Friday, April 17th, to retain all writings in this arbitration (which should be done in any case) and to turn off any auto-delete features for emails and other e-documents, because these documents and related meta-data may be needed. Mr. Rosen responded appropriately, and I disclosed a glitch in the transfer of a massive amount of files a few years ago that appears to have eliminated some emails, but I believe that others will have copies. Mr. White did not comment or otherwise respond to this request either.

It was this concern about Mr. White's Dissent, and this concern alone, that led me to ask counsel for their comments about the continuation of the panel's now quite limited jurisdiction. I thought that the issues involving Mr. White's Dissent went directly to the integrity of the arbitration process, and that both counsel probably would think they would be better handled by the courts, especially in light of that which remains for the panel might be called upon to decide. Had both parties advised or requested that our jurisdiction be terminated, I believe that the panel would have agreed to do so. However, I certainly did not suggest in my initial communication on this subject that our jurisdiction should be terminated, so there was nothing for IRB's counsel to "agree" to.

3

For the avoidance of doubt, the panel confirms that its retained jurisdiction remains unchanged, and that it expects compliance by the parties with the rulings set forth in the Final Decision and Award so that we may complete our charge.

Each member of the majority is willing to make available to the court(s) any and all of the detailed confidential communications among the three panelists, to respond under oath to any and all questions concerning this case, and to assist the court(s) in any other manner.  Hence our continuing request that the parties provide the panel with contact information for any and all courts in which the Dissent has been submitted.  Also, the majority requests that we be provided with the filings in any litigation where allegations are made regarding our service on this arbitration panel.

Thank you,


Dan Schmidt, IV
Umpire

4