**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                   :

NATIONAL INDEMNITY COMPANY,        :
                                   :

                    Petitioner,   :      **Case No.  15-cv-3975 (NRB)**
                                   :

     - against -                 :

                                   :      **ORAL ARGUMENT**
IRB BRASIL RESSEGUROS S.A.,        :      **REQUESTED**

                    Respondent.   :

                                   :
------------------------------------------------------------------x

<br>

## MEMORANDUM OF LAW IN SUPPORT OF PETITION
## <u>TO CONFIRM THE ARBITRATION AWARDS</u>

<br><br>

CLYDE & CO US LLP
Michael A. Knoerzer
Stephen M. Kennedy
Gregory S. Hoffnagle
405 Lexington Avenue, 16th Floor
New York, NY  10174
Telephone: (212) 710-3900
Fax: (212) 710-3950

*Attorneys for Petitioner*
*National Indemnity Company*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 1

A.  The Parties .......................................................................................................... 1

B.  The Contracts at Issue in the Arbitration ........................................................... 2

C.  The Arbitration Between NICO and IRB ........................................................... 4

    1.   Selection of the Umpire ................................................................................ 4

    2.   The Issues In And Conduct Of The Arbitration ........................................... 9

ARGUMENT ................................................................................................................ 20

A.  The Awards Are Confirmable Under the FAA and the New York Convention ..... 20

CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agility Pub. Warehousing Co. K.S.C. v. Supreme Foodservice GmbH,*
   495 Fed. Appx. 149 (2d Cir. 2012)................................................................20

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust,*
   729 F.3d 99 (2d Cir. 2013)...........................................................................20

*Scandinavian Reins. Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.,*
   668 F.3d 60 (2d Cir. 2012)...........................................................................20

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,*
   126 F.3d 15 (2d Cir. 1997)...........................................................................21

**Statutes**

9 U.S.C. § 9.........................................................................................................20

9 U.S.C. § 10.......................................................................................................21

9 U.S.C. § 11.......................................................................................................21

9 U.S.C. § 203.....................................................................................................20

9 U.S.C. § 207.....................................................................................................21

## INTRODUCTION

Petitioner, National Indemnity Company ("NICO"), respectfully submits this memorandum of law in support of its consolidated Petition to Confirm three Arbitration Awards[1] bearing dates January 15, 2015, April 15, 2015 and May 15, 2015 (collectively, the "Awards"), which Awards were issued by a Panel of three arbitrators (or at least a two-member majority of them) in an arbitration brought by NICO against IRB Brasil Resseguros S.A. ("IRB").

The Court's consideration of this action is governed by the Federal Arbitration Act ("FAA") and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").  Under the statutory framework set out by the FAA and the New York Convention, arbitration awards "shall" be confirmed absent very narrow circumstances not present here.  Based upon the following, NICO therefore respectfully requests that all three Awards be confirmed forthwith as judgments of this Court.

## STATEMENT OF FACTS

### A.      The Parties

Petitioner NICO is a Nebraska insurance company writing direct insurance policies and reinsurance contracts[2] covering risks in the United States and internationally.  Respondent IRB was, at all times relevant, the state-owned Brazilian national reinsurer that reinsures direct insurance policies written by insurance companies based in Brazil.  Relevant to this matter, IRB

---

[1] NICO had previously filed three separate petitions to confirm the Awards on February 18, 2015 (15-cv-1165 (NRB)), April 28, 2015 (15-cv-3310 (NRB)), and May 22, 2015 (15-cv-3975 (NRB)).  By order dated June 24, 2015 the Court instructed NICO to file a single consolidated petition addressing all three of the Awards.  Order at 3, *Nat'l Indem. Co. v. IRB Brasil Resseguros, S.A.*, 15-cv-3975 (NRB) (S.D.N.Y. 2015), ECF No. 9.

[2] Reinsurance is an arrangement whereby an insurer (the "reinsured" or the "ceding company") cedes or transfers all or part of the risk on an underlying insurance policy or group of policies to a reinsurer, which agrees to indemnify the ceding company for the risk transferred in exchange for receiving premium.  Reinsurers may, in turn, cede all or part of the risk they have agreed to reinsure to other reinsurers.  This reinsurance of reinsurance is known as retrocessional coverage and the reinsurer ceding the risk and the reinsurer accepting the risk are referred to as, respectively, the retrocedent and the retrocessionaire.

reinsured two insurance policies issued by Brazilian insurers to Companhia Siderurgica Nacional ("CSN"), a steel, iron ore and mining conglomerate located in Brazil. The first policy, issued by Brazilian insurer Sul America, S.A., covered CSN for the time frame January 29, 2007 through February 21, 2008. The second policy, issued by Brazilian insurer Mapfre, S.A., covered CSN for the time period from February 21, 2008 through February 21, 2009. IRB reinsured substantially all of the risk insured by Sul America and Mapfre under their policies issued to CSN.

**B**.    **The Contracts at Issue in the Arbitration**

NICO in turn issued two reinsurance contracts to IRB reinsuring a portion of IRB's liability to the Brazilian insurers which insured CSN. The first reinsurance contract (the "2007 Contract") reinsured IRB for the period November 21, 2007 through February 21, 2008.[3] The second reinsurance contract (the "2008 Contract") reinsured IRB for the period February 21, 2008 through February 21, 2009.[4]

The coverage of CSN, and the reinsurance provided by IRB and NICO, is depicted in the following chart:



---

[3] NICO provided limits of $60,850,000 through four layers of coverage above a $25 million retention under the 2007 Contract.
[4] NICO provided two layers of coverage above a $10 million retention, for a total of $189,680,000 under the 2008 Contract.

As shown in the above chart, if a loss occurred on a date before November 21, 2007, that loss would be covered by the Brazilian insurers and IRB, but not NICO.

The 2007 Contract and 2008 Contract contain broad arbitration clauses which provide as follows:

> If any dispute shall arise among the Reinsured and the Reinsurer with reference to . . . this Insurance, such dispute, upon the written request of either party, shall be submitted to three arbitrators, one to be chosen by either party, and the third by the two so chosen.  . . . .  If the two arbitrators fail to agree in the selection of a third arbitrator within 30 days of their appointment, each of them shall name two, of whom the other shall decline one and the decision shall be made by drawing lots.  All arbitrators shall be active or retired officers of insurance or reinsurance companies not under the control of either party to this certificate.
>
> The arbitrators shall interpret this certificate as an honorable engagement and not as merely a legal obligation.  They are relieved of all judicial formalities and may abstain from following the strict rules of law.  They shall make their award with a view to effecting the general purpose of this certificate in a reasonable manner rather than in accordance with a literal interpretation of the language. . . . .
>
> The decision in writing of any two arbitrators when filed with the parties hereto, shall be final and binding on both parties.  Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction. . . . . Said arbitration shall take place in New York, N. Y. and under New York State law unless some other place is mutually agreed upon by the Reinsured and the Reinsurer.

(the "Arbitration Agreements").  *See* ¶ 14 of NICO's Petition to Confirm the Arbitration Awards, dated July 14, 2015.[5]

---

[5]  All references cited herein refer to paragraphs or footnotes in NICO's corresponding Petition to Confirm the Arbitration Awards, dated July 14, 2015.

**C.   The Arbitration Between NICO and IRB**

In September 2008, IRB, by its agent Catalyst Re Consulting, L.L.C. ("Catalyst Re"),[6] gave notice to NICO of a sizable property and business interruption loss incurred by CSN in Brazil (the "CSN Property Loss").  According to that notice, the CSN Property Loss potentially impacted NICO under the 2007 Contract or the 2008 Contract.  By December 31, 2008, NICO demanded arbitration against IRB under each of the 2007 and 2008 Contracts seeking a declaration that it had no coverage obligations with respect to the CSN Property Loss.

**1.   Selection of the Umpire**

In 2009, pursuant to the Arbitration Agreements, the parties each appointed a party-arbitrator and thereafter exchanged the names of three persons proposed to serve as umpire.  The parties also agreed to request that the umpire candidates complete a questionnaire for the purpose of determining their suitability to serve as umpire. A questionnaire was sent to Daniel E. Schmidt, Esq., who returned a completed questionnaire to the parties in December 2009.  *See* ¶ 18.  The questionnaire asked Mr. Schmidt to disclose all involvements with NICO's and IRB's counsel, the other two party arbitrators and, more specifically, asked about Mr. Schmidt's involvement with the parties or entities (including CSN and Catalyst Re) "or any subsidiaries, affiliates or parent companies of such parties or entities."  *See id.*   Mr. Schmidt, a very experienced reinsurance arbitrator who has worked on over 345 reinsurance arbitrations as umpire and arbitrator, and has served in senior executive positions at reinsurance companies, specifically responded to the questions and disclosed, in relevant part, that – as of the date of his response – he had previously served as an umpire in a matter involving IRB, had not served on any matters involving NICO, and had served as an arbitrator on matters involving NICO

---

[6] Catalyst Re is a New Jersey-based reinsurance broker specializing in South American business.  At the arbitration, Catalyst Re's principal, Alexandre Leventhal, acknowledged that he was acting as the agent for IRB when the reinsurance contracts were placed with NICO.  *See* ¶ 15, n. 6.

affiliates.  *See* ¶ 19.  With regard to the question that asked whether he had ever "served as an

arbitrator, umpire, attorney or expert witness in a matter involving any of the parties or entities

listed above or any subsidiaries, affiliates or parent companies" of the parties (and CSN or

Catalyst Re), Mr. Schmidt wrote a precise and thorough response, which demonstrated his clear

understanding and accurate response of the question presented:

> Since 1993, 25 arbitrations where General Re[7] or a Gen Re
> subsidiary was involved: 11 as umpire (5 settled); 13 as party
> appointed "for" (7 settled; one dormant since 2007 appointment); 1
> as party appointed "against."  1996-98: umpire in an arbitration
> involving IRB.

*See* ¶ 20.  Notably, the questionnaire inquired about a specific list of companies –"subsidiaries,

affiliates or parent companies" – and did not ask Mr. Schmidt to reveal whether he was involved

in any matters for IRB's or NICO's <u>reinsureds</u>.  *See* ¶ 21.  Mr. Schmidt also fully disclosed his

previous engagements as party arbitrator, umpire, expert witness or consultant in arbitrations for

counsel for IRB and NICO:

> Mike Knoerzer (with former firms and M. Knoerzer as lead or co-
> lead): 5 times - twice as umpire; once as party arbitrator "for" and
> once as party arbitrator "against," Clyde & Co./ M. Knoerzer –
> selected as umpire by American Arbitration Association in
> September 2009; Hearing currently scheduled for 1/10.

*See id*.  Tellingly, IRB did not and has never challenged the truth of Mr. Schmidt's disclosures at

the time he made them.

The U.S. arbitration process between NICO and IRB remained dormant for two years as

the parties fought certain jurisdictional issues in a London arbitration.  By the fall of 2011, these

London skirmishes were concluded and the parties returned to the U.S. arbitrations, where the

parties reduced the candidates for umpire down to two: Mr. Schmidt and a Mr. William Trutt.

Because Mr. Trutt had not yet been given a questionnaire, and because nearly two years had

---

[7]  General Reinsurance Corporation is an affiliate of NICO.

passed since Mr. Schmidt had provided his questionnaire response, NICO, by letter dated

October 13, 2011, suggested to the two party arbitrators that fresh questionnaires be sent to both

Mr. Schmidt and Mr. Trutt: "NICO, consistent with industry practice in reinsurance arbitrations,

requests that you solicit responses to the attached umpire questionnaire from candidates Daniel

Schmidt and William Trutt." *See* ¶ 24.  IRB, swiftly interceding before NICO's request could be

acted upon by the arbitrators, filed a petition in this Court seeking an order compelling NICO to

select an umpire without any questions of Mr. Trutt being asked in advance.  IRB's Amended

Petition at 8-9, *IRB Brasil Resseguros S.A. v. Nat'l Indem. Co.*, No. 11-cv-1965 (NRB) (S.D.N.Y.

2011), ECF No. 28.

On October 21, 2011, a transcribed hearing was held before the Court at which IRB's

counsel argued:

> At this stage there is nothing in the agreement that calls for a [sic]
> questionnaires.  What we would like to have happen is the coin
> toss.  Mr. Dowd [later replaced by Mr. Rosen][8] and Mr. White
> should toss a coin, determine who is the umpire in Arbitration 3.
> [NICO] can make their requests of whoever it is because we don't
> even know it [sic] will be Mr. Trutt at this stage and he can answer
> and respond at the organizational meeting just like happens at
> every one of those arbitrations.

Transcript of Proceedings re: Conference at 19:6-14, *IRB Brasil Resseguros S.A. v. Nat'l Indem.*

*Co.*, No. 11-cv-1965 (NRB) (S.D.N.Y. 2011), ECF No. 41.  In other words, IRB wanted the

umpire to be chosen (by random selection) based on no disclosures by Mr. Trutt and the

December 2009 disclosures by Mr. Schmidt.

At the conclusion of the October 21, 2011 hearing, the Court directed the parties to

submit briefs on the issues.  *Id.* at 19:17-20:1.  In its brief, NICO not only requested that IRB's

---

[8]  Jonathan Rosen replaced NICO's initial arbitrator selection, a change upheld by the Court in its order dated
October 5, 2011.  Memorandum and Order at 5-7, *IRB Brasil Resseguros, S.A. v. Nat'l. Indem. Co.*, No. 11-cv-1965
(NRB) (S.D.N.Y. 2011), ECF No. 21.

umpire candidate, Mr. Trutt, be requested to answer a questionnaire, but that NICO's umpire candidate, Mr. Schmidt, also be requested to update his 2009 questionnaire responses. Memorandum of Law for NICO at 4 & n. 2, 19, *IRB Brasil Resseguros S.A. v. Nat'l. Indem. Co.*, No. 11-cv-1965 (NRB) (S.D.N.Y. 2011), ECF No. 30.  In its argument to the court, IRB vehemently opposed sending questionnaires to either candidate:

> The law is clear.  Since the Arbitration Agreement does not contain a requirement for questionnaires, NICO cannot seek to impose that condition on proceeding with the drawing of lots.

IRB's Reply Memorandum of Law at 12, *IRB Brasil Resseguros S.A. v. Nat'l. Indem. Co.*, No. 11-cv-1965 (NRB) (S.D.N.Y. 2011), ECF No. 36.

Subsequent to briefing and oral argument, the Court found that the parties had agreed that each umpire candidate complete a single questionnaire, and therefore the Court ordered only that Mr. Trutt respond to a questionnaire.  Memorandum and Order at 16, *IRB Brasil Resseguros S.A. v. Nat'l. Indem. Co.*, No. 11-cv-1965 (NRB) (2011), ECF No. 40.  No such order was made with respect to Mr. Schmidt, who had already completed a questionnaire albeit 3 years earlier.  Judge Buchwald also warned the parties, particularly NICO, not to delay Umpire selection on pain of court sanction.  *Id.* at 17.[9]

Thereafter, the parties employed a pre-agreed random selection method that resulted in the selection of Mr. Schmidt as umpire.[10]  After being advised that he was selected as the Umpire, Mr. Schmidt voluntarily undertook to update the disclosures he had made almost three years earlier in his December 2009 questionnaire response.  *See* ¶ 31.  Notably, Mr. Schmidt

---

[9]  Although Mr. Trutt did produce a questionnaire, it was materially incomplete, and NICO proposed that Mr. Trutt be asked to amplify his disclosure.  *See* ¶ 30, n. 9.  IRB refused NICO's proposal and threatened that any delay by NICO would be seen as bad faith if NICO did not immediately pursue umpire selection without further disclosures from the two umpire candidates.  *See id*.

[10]  Neither party disputes that the agreed selection process was properly followed and that the process produced Mr. Schmidt as umpire.

reported that, since his last contact with the parties in 2009, he had received assignments from both counsel for IRB and counsel for NICO.  *See* ¶ 32.  Specifically, Mr. Schmidt disclosed – in response to the question: "Have you ever served as an arbitrator, umpire, expert witness or consultant in an arbitration or litigation at the request of any counsel or law firm involved in this arbitration . . . ." – that IRB's counsel had hired him to serve as an expert witness in an arbitration in 2010.  *See* ¶ 33.  In response to the same question, Mr. Schmidt also disclosed that he was asked by NICO's counsel to serve as a party-appointed arbitrator for its client, Equitas, Ltd. ("Equitas").  *Id.*  Equitas is an independent company and is licensed and doing business in the United Kingdom, with its own Board of Directors.  NICO reinsures Equitas' pre-1993 non-life insurance and reinsurance liabilities 100% subject to an overall cap.  *See* ¶ 34.

Upon receiving Mr. Schmidt's updated disclosures, IRB's counsel complained that (1) Mr. Schmidt's role as party-appointed arbitrator for Equitas was not disclosed in advance of his selection as Umpire and (2) that this role as a party-appointed arbitrator for Equitas disqualified him from serving as Umpire in the NICO-IRB arbitration because NICO reinsured Equitas and NICO's affiliate, Resolute Management, administered Equitas' claims.  *See* ¶ 35.  In that very same letter, IRB acknowledged Mr. Schmidt's esteemed reputation in the reinsurance industry, stating: "You are highly respected in the industry and we, like counsel, hold you in high regard." *See* ¶ 36.  In response to IRB's challenge, Mr. Schmidt asked the parties to provide written submissions focusing upon (a) the parties' communications regarding pre-selection disclosures for umpire candidates and (b) whether his participation as party arbitrator for Equitas constituted a basis in law that barred him from participating as Umpire in the arbitration between NICO and IRB.  *See* ¶ 37.  In response to Mr. Schmidt's request, NICO submitted correspondence showing that it was NICO all along that sought an updated disclosure from Mr. Schmidt and that it was

IRB all along that not only opposed questionnaires, but brandished the Court's threat of sanctions against NICO in the event the selection did not proceed without questionnaires. *See* ¶ 38.  NICO also submitted case authorities demonstrating that an Umpire's service in another matter as a party-arbitrator – even one involving the affiliates of parties – cannot be deemed "evident partiality" or a basis for the Umpire's recusal. *See* ¶ 39.  After extensive letter briefing from the parties, Mr. Schmidt determined he could properly proceed as the Umpire in the Arbitration. *See* ¶ 40.

### 2.  The Issues In And Conduct Of The Arbitration

Although NICO initiated arbitration by sending two separate demands for arbitration, one under the 2007 Contract, and one under the 2008 Contract, the parties mutually agreed to consolidate the arbitrations under the 2007 and 2008 Contracts before a panel consisting of Mr. Schmidt, as the Umpire, Jonathan Rosen as NICO's party-appointed arbitrator, and James P. White as IRB's party-appointed arbitrator (the "Panel").

At the outset of the arbitration, NICO questioned whether the CSN Property Loss occurred on a date (the "Date of Loss") within the coverage period of either NICO's 2007 Contract or 2008 Contract.  At a transcribed hearing before the arbitration Panel in July 2012, IRB, by its counsel, represented to the Panel that the Date of Loss was not yet known or agreed to by the parties, but was an issue that was in dispute between IRB and CSN and would be resolved by a Brazilian Court in pending coverage litigation between them. *See* ¶ 43.  In light of this representation by IRB's counsel, there was an open question as to whether the loss would fall within the coverage periods of NICO's 2007 or 2008 Contracts.  With the Panel's approval, the parties agreed in 2012 to stay the arbitration pending resolution of the coverage litigation in

Brazil and determination of whether the loss occurred within the period of either of NICO's two reinsurance contracts.

In November 2013, CSN and IRB entered into a settlement agreement resolving CSN's claims against IRB concerning the CSN Property Loss for the amount of US $166,391,030.33 (the "Settlement Agreement").  *See* ¶ 45. Five months later, by correspondence dated March 11, 2014, IRB revealed the existence of the Settlement Agreement to NICO.  *See id*.  Although the Settlement Agreement itself did not reflect when the loss occurred, IRB's March 11, 2014 correspondence to NICO (which did not include a copy of the Settlement Agreement) declared that the Date of Loss was December 1, 2007, thereby purportedly placing the loss within the period of NICO's 2007 Contract, but leaving the 2008 Contract untouched.  *See* ¶ 46.  IRB demanded NICO pay $41,364,857.81 under the 2007 Contract, but made no demand under the 2008 Contract.  *See* ¶ 47.

Undisclosed to NICO at this time was the fact that CSN and IRB had also secretly entered into a side agreement at the same time they entered into the Settlement Agreement (the "Secret Side Deal"). Under the terms of the Secret Side Deal, IRB and CSN agreed to take the position, with retroactive effect, that NICO's 2008 Contract – about which NICO and IRB had been in arbitration for four years – did not exist.  *See* ¶ 48.  IRB pledged in the Secret Side Deal to assist CSN in recovering the premium NICO had received for the 2008 Contract over five (5) years earlier, safe in the knowledge that no losses had occurred during the period covered by the 2008 Contract that would allow CSN to make a claim for coverage.  *See* ¶ 49.  IRB did not reveal this Secret Side Deal to NICO or the Panel at the time IRB reported the Settlement Agreement to NICO and the Panel.  Instead, IRB merely included a Portuguese language copy of the Secret Side Deal, without translation, in its two hundred thousand (200,000) page document production.

NICO learned of the Secret Side Deal in August 2014 during the depositions of IRB's witnesses, even though none of these witnesses were actually involved in negotiating the Secret Side Deal or were even aware of its negotiation.

In response to IRB's March 11, 2014 correspondence regarding the Settlement Agreement, NICO raised a number of questions, two of which are noteworthy here (1) how was the December 2007 Date of Loss determined? and (2) could IRB confirm that NICO would have no obligation whatsoever under the 2008 Contract? *See* ¶ 51.  When IRB provided only vague and non-committal responses to NICO's questions, NICO asked the arbitration Panel to order IRB to provide responses.  IRB opposed NICO's request, asserting that IRB's claims must be accepted on their face without any further disclosures.

In May 2014, the Panel <u>unanimously</u> ordered IRB to provide explanations and supporting documents in response to NICO's questions, including when and how the alleged December 1, 2007 Date of Loss was determined.  *See* ¶ 53.  It was *only* at this juncture in the Arbitration, when confronted with the Panel's unanimous order to provide support for IRB's claims, that IRB's counsel erupted in a lengthy and vicious denunciation of Mr. Schmidt and Mr. Rosen as being biased against IRB because the arbitrators did not accept IRB's claim as presented, but required proof of the facts underlying that claim.  *See id.*  Together with its letter personally attacking Mr. Schmidt and Mr. Rosen, IRB thereafter produced an unauthenticated document purporting to be a legal opinion by its counsel in Brazil and an affirmation from Sul America employee Arthur Mitke.  IRB subsequently submitted a letter to the Panel dated July 9, 2014 which included what was represented to be the affidavit of Paulo Penido Pinto Marques ("Mr. Marques" or "Mr. Penido"), a former employee of CSN.  *See* ¶ 54.

In response to IRB's pre-hearing evidentiary submissions, NICO submitted a motion (1) to strike the affirmations of Messrs. Mitke and Marques unless these witnesses were made available for cross-examination by NICO; and (2) challenging IRB's selective waiver of the privilege – that is, NICO sought an order requiring IRB to either produce all legal opinions by IRB's attorneys or withdraw the legal opinion that it had selectively produced.  (IRB had categorically refused to produce any legal opinions concerning the underlying claims during discovery).

In response to NICO's motion, IRB represented that it would not rely upon the legal opinion at the arbitration hearing (the "Hearing"), thus mooting that part of NICO's motion.  As respects the witness, Mr. Mitke, IRB represented that Mr. Mitke was unable to travel to the U.S. to testify at the Hearing, and therefore proposed to provide the testimony of Tomas Lyra, a Sul America "representative", as a substitute for Mr. Mitke.  With regard to the affirmation of Mr. Marques, IRB continued to insist that the Panel accept that affirmation without a chance for NICO to cross-examine the witness.  *See* ¶ 57.  By email dated September 24, 2014, the Panel unanimously asked IRB to make Messrs. Mitke and Marques available to testify at the Hearing by videoconference.  By email on October 2, 2014 at 10:55 a.m., IRB expressed its "dismay[]" that the panel decided to exclude Mr. Lyra," and confirmed that Mr. Mitke would be available to testify by video conference at the Hearing and that it was attempting to arrange the same with Mr. Marques.

One day later, on October 3, 2014 at 12:28 p.m., by majority decision, the Panel issued Case Management Order #12 granting NICO's motion to strike the affirmations of Messrs. Mitke

and Marques and denying IRB's offer to substitute Mr. Lyra.[11]  *See* ¶ 60.  In the same order, the

Panel expressed its willingness to do anything to accommodate the schedules of Messrs. Mitke

and Marques to testify at the Hearing.  *Id.*  Although IRB stated multiple times during the first

week of the Hearing in November 2014 that it was still working to make Mr. Marques available

to testify via videoconference, it ultimately informed NICO and the Panel that Mr. Marques

would not testify.

       Throughout the course of the Arbitration, both in 2012 and 2014, extensive discovery

occurred.  As part of the discovery process, the Panel made numerous rulings, often on a

unanimous basis, many of which were adverse to NICO, forcing NICO to produce documents

and to make available several of its senior most executives available for deposition.  *See* ¶ 61.

Prior to the Hearing, NICO also submitted two motions for summary adjudication which were

denied entirely by the Panel.  *See id*.

       The Hearing was held in New York City during November 2014.  In its Pre-Hearing

Brief and opening statement, NICO requested rulings that:

- NICO had no obligation to provide coverage for the CSN Property Loss under either the 2007 or 2008 Contract because the Date of Loss preceded either of NICO's coverage periods;

- NICO properly issued the 2008 Contract and was entitled to keep the premium NICO received for that 2008 Contract; and

- NICO was entitled to be held harmless and indemnified by IRB with respect to any amounts that NICO would be required to pay as a result of any claim for the return of premium under the 2008 Contract.

- NICO was entitled to its attorneys' fees and costs incurred in the Arbitration.

*See* ¶ 62.

---

[11] IRB never explained how it knew of the Panel's decision a full day before the Panel issued it.  Subsequent events strongly suggest, however, that IRB's counsel was engaging in unauthorized and improper ex parte communications with Mr. White concerning Panel deliberations.  *See infra* p. 17, n. 13.

At no time before or during the Hearing did IRB ever contend that the Panel lacked jurisdiction to hear or rule on NICO's requests for relief concerning the 2008 Contract.  Instead, IRB addressed NICO's claims on the merits, arguing that NICO's concerns about the prospect of CSN making a claim under the Secret Side Deal were overblown because any claim CSN might make for recovery of the premium under the 2008 Contract was invalid on statute of limitations grounds.  *See* ¶ 63.

As for IRB's claims at arbitration, IRB sought a ruling that NICO was bound to cover the CSN loss, and to pay $41,364,857.81 in losses, plus interest, and IRB's attorney fees.  Other than denial of NICO's claims, IRB sought no affirmative relief concerning the 2008 Contract.  IRB did, however make numerous references to the existence of the 2008 Contract in its Pre-Hearing Brief, during its Opening Statement at the Hearing, during the testimony of the broker, Catalyst Re and during IRB's Closing Arguments.  *See* ¶ 64.

During the November 2014 Hearing, both parties submitted extensive documentary evidence, witness testimony and argument to the Panel concerning the issues in dispute.  The parties jointly marked and provided to the Panel over four hundred and fifty (450) exhibits to be admitted into evidence; the Hearing itself lasted seven (7) days during which the Panel heard testimony from seven (7) different witnesses, including Mr. Mitke by videoconference.[12]  The transcript of the testimony ran one thousand seven hundred and forty (1,740) pages.  On the final day of the Hearing, both IRB and NICO agreed to close the record.

It was not long after the Hearing that events disproved IRB's assurances that CSN would never bring a claim against NICO under the Secret Side Deal.  On November 26, 2014, two weeks after the Hearing ended, CSN wrote to NICO demanding the return of the premium that

---

[12] Despite IRB's indications that they intended to have Mr. Marques testify by videoconference, Mr. Marques never appeared at the hearing.

NICO had received under the 2008 Contract.  As the centerpiece of its claim against NICO, CSN touted the language in the Secret Side Deal in which IRB agreed, five years after the fact, that it had not purchased the 2008 Contract from NICO.  In response to this post-Hearing development, NICO requested that the Panel allow NICO to reopen the record for the limited purpose of admitting CSN's demand into the record.  After receiving correspondence from both NICO and IRB on the issue, the Panel issued Case Management Order #15, which allowed certain new documents (including CSN's demand) to be part of the record.  *See* ¶ 69.

On January 15, 2015, a majority of the Panel issued the first of its three awards.  The January 15, 2015 Award declared that IRB had not established by reasonable evidence that the Date of Loss was within NICO's coverage period and thus, NICO had no obligation to cover IRB's claim for the CSN Property Loss under the 2007 Contract, explaining their reasoning in twelve single-spaced pages (the "January 15 Award").  *See* ¶ 70.  The Panel also expressly stated that it would retain jurisdiction over the parties' joint requests for an award of their costs and fees, as well as NICO's requests under the 2008 Contract, ordering further submissions by the parties with respect to those open issues be submitted by January 22, 2015.  *See* ¶ 71.

Thereafter, both parties made submissions to the Panel regarding the 2008 Contract and regarding their claims for attorneys' fees.  It was in this submission – well after the Hearing was over – that IRB argued for the first time that the Panel did not have jurisdiction to hear or rule on NICO's requests under the 2008 Contract.  *See* ¶ 72.  Based on the parties' respective submissions, a majority of the Panel ordered further briefing by the parties concerning: (1) the Panel's jurisdiction to hear NICO's requests for relief under the 2008 Contract; and (2) the merits of NICO's requests for relief under the 2008 Contract.  Pursuant to that order, the parties made additional, simultaneous submissions on March 6 and 13, 2015.  NICO's submissions included

numerous instances during the course of the arbitration proceedings where IRB had made reference to the existence and terms of the 2008 Contract.

By award dated April 15, 2015, a majority of the Panel confirmed that it had jurisdiction to hear NICO's requests for relief under the 2008 Contract and ruled that: (1) IRB was reinsured by NICO under the 2008 Contract; (2) NICO was entitled to keep the premium under the 2008 Contract; and (3) IRB must indemnify and hold NICO harmless for any claim asserted by CSN for the premium paid to NICO under the 2008 Contract (the "April 15 Award"). *See* ¶ 75. With regard to the parties' competing claims for attorneys' fees and costs, the Panel denied NICO's request for all of its fees incurred since the beginning of the arbitration in 2012 and instead directed IRB to pay (1) NICO's fees and costs for the arbitration from March 11, 2014 onward and (2) NICO's fees and costs in connection with CSN's premium collection efforts. *See* ¶ 76. The Panel also modified its Confidentiality Order to permit the parties to use confidential arbitration materials in any litigation concerning a claim by CSN for premium under the 2008 Contract. *See* ¶ 77. Finally, the Panel retained jurisdiction to ensure compliance with the award. *See id.*

Through this date, IRB's party-appointed arbitrator, Mr. White, never published a reasoned dissenting opinion to any Panel ruling – ever. On April 16, 2015 (less than twenty-four (24) hours after the April 15 Award had been issued), Mr. White published an email to the other two arbitrators and the parties' counsel, attaching, without description or explanation, a document simply labeled "Dissent," where Mr. White dissented from not only the January 15 Award, but the April 15 Award issued three months earlier. *See* ¶ 78. In the Dissent, Mr. White charged that the Umpire of the arbitration Panel was biased in favor of NICO and invited "the court" to closely scrutinize the alleged bias of the Arbitration process and the Awards, stating: "the

legitimacy of this arbitral process require[d] **careful** scrutiny by the court," and "[t]his [April 15] Award has no basis in fact, evidence or law and should be carefully scrutinized by the courts." *See* ¶ 79.  Notably, Mr. White devoted three single-spaced pages in his "dissent" to the April 15 Award, which had been issued the night before.  *See id*.  The next day, IRB filed the Dissent in this Court in support of its Motion to vacate the January 15 Award, which it had filed the day before.

Apparently recognizing Mr. White's "Dissent" as having a style unlike anything else Mr. White had historically written, the other two arbitrators asked Mr. White whether he was actually the author of the Dissent.  Subsequently, those two arbitrators reported that Mr. White had announced that he would not answer questions about the provenance of the Dissent.  By letter dated May 1, 2015, counsel for NICO asked counsel for IRB, which had been silent until this time regarding the Dissent's authorship, to confirm they had no role in preparing the Dissent. IRB's counsel, by letter of May 11, 2015, admitted that they had, in violation of the prohibition on ex-parte communications with the Panel members,[13] communicated on an ex-parte basis with Mr. White, gave him documents and transcript citations selected by counsel, and even provided Mr. White with a draft of the Dissent.  Also on May 11, 2015, IRB's counsel sent a letter to the Court withdrawing the Dissent and requesting that the Court ***not*** consider it, and also sent to the Panel a copy of NICO's May 1, 2015 letter concerning the Dissent and IRB's May 11, 2015

---

[13]  The Panel and the parties decided at the first organizational meeting that there would be no *ex parte* communications with the party arbitrators after motions were fully briefed and after the submission of pre-hearing briefs. *See* ¶ 82, n. 13.

response.[14]  *See* Letter addressed to Judge Buchwald, *Nat'l. Indem. Co. v. IRB Brasil Resseguros, S.A.*, No. 15-cv-1165 (NRB) (S.D.N.Y. 2015), ECF No. 47.

Meanwhile, the briefing process set out by the Panel continued.  NICO asked the Panel, among other things, for an award confirming that IRB must pay NICO $2,524,486.40  in fees (based on the criteria set forth in the Panel's April 15, 2015 Award), and that the Panel rescind its confidentiality order.  *See* ¶ 84.  In an attempt to keep its improper conduct concealed from the public, IRB wrote the Panel by letter dated May 14, 2015 arguing that while the Panel continued to have jurisdiction with respect to NICO's requests for costs, it did not have authority to issue any more rulings concerning confidentiality.  *See* ¶ 85.

By email dated May 14, 2015, the majority of the Panel issued a ruling which, *inter alia*, further modified its confidentiality order by permitting the parties to use all arbitration material in any proceeding involving them, their counsel and the arbitrators:

> [I]n response to NICO's request based on the use by IRB of [the White dissent] in court proceedings, the panel's Confidentiality Order is further modified to authorize the parties, counsel, and the panel members to use the Arbitration Information in any court, arbitral, or any other proceeding involving any of them.

*See* ¶ 86.

On May 15, 2015, the Panel issued its last award which ordered IRB, among other things, to pay $2,524,486.40 in attorneys' fees and costs incurred by NICO in connection with the arbitration and CSN's claim for premium under the 2008 Contract (the "May 15 Award").  *See* ¶

---

[14] Thus the dissent issued by Mr. White, the provenance of which he would not confirm, was written with the express purpose of influencing a court toward the losing party's position that the Panel and process were tainted by bias, even though Mr. White had never issued a statement suggesting anything of the kind and, as IRB's prior counsel has essentially conceded, it is not clear whether the initiative for the *ad hominem* attacks on the Panel in the Dissent came from Mr. White at all.

87.[15] On June 11, 2015, the majority of the Panel notified the parties that the Panel had relinquished jurisdiction over the arbitration as of that same date.  *See* ¶ 88.

Prior to the Panel's last award, IRB's counsel, by email dated April 17, 2015, wrote to Mr. Schmidt re-asserting its position that he should not have agreed to serve as Umpire "due to conflicts" and requested that he provide additional disclosures concerning NICO and "all related affiliate entities of Berkshire Hathaway."  *See* ¶ 89.  Mr. Schmidt responded by email dated May 4, 2015, noting that IRB had never asked any panel member during the arbitration to update their disclosures but had "made clear throughout this arbitration" that it considered his service as Equitas' party-arbitrator as "being an employee, or a hired gun, or a subject or servant of NICO." *See* ¶ 90.  Mr. Schmidt explained that his appointment did not create a conflict because NICO was merely Equitas' reinsurer and that, as a matter of custom and practice, the identities of appointing parties' reinsurers or retrocessionaires are not known to arbitrators and that NICO's affiliate, Resolute Management, merely administered the Equitas claims.  *See* ¶ 91.  He then advised that in March 2015 he had been appointed as party arbitrator *against* an entity (CNA) whose claims were being handled by Resolute Management.  *See id.*  Mr. Schmidt also advised that he had been re-appointed to serve as Equitas' arbitrator in a matter relating to the prior arbitration that was the subject of his supplemental disclosures in January 2012 because Equitas' adversary had appointed the same arbitrator and the dispute involved the interpretation of the decision rendered by the panel in the prior arbitration.  *See* ¶ 92.  Mr. Schmidt confirmed that a law firm different from NICO's counsel was representing Equitas.  *See id.*   IRB did not object or otherwise respond to Mr. Schmidt's May 4 email.

---

[15]  The May 15 Award also ordered IRB to produce to NICO written communications between it and Mr. White from January 1 to May 15, 2015 and noted that the Panel would retain jurisdiction over this issue.  Since then, however, the Panel has terminated its jurisdiction.  NICO, therefore, does not seek confirmation of that portion of the May 15 Award ordering IRB to produce its written communications with Mr. White.

## ARGUMENT

### A.  The Awards Are Confirmable Under the FAA and the New York Convention

Because the Arbitral Awards were entered in the United States and involve a foreign corporation (IRB), both the FAA and the New York Convention apply.  *See Scandinavian Reins. Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.,* 668 F.3d 60, 71 (2d Cir. 2012).  Accordingly, NICO's Petition is made under both 9 U.S.C. § 9 of the FAA and Chapter 2 of the FAA, § 201-208, which implements the New York Convention.[16]

Consistent with the strong public policy in favor of arbitration, the review of arbitral awards is very limited under both the FAA and the Convention.  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 103 (2d Cir. 2013) ("The role of a district court in reviewing an arbitration award is narrowly limited and arbitration panel determinations are generally accorded great deference under the Federal Arbitration Act.") (internal citations and quotation marks omitted); *Agility Pub. Warehousing Co. K.S.C. v. Supreme Foodservice GmbH*, 495 Fed. Appx. 149, 151 (2d Cir. 2012) (stating review of arbitral awards under the New York Convention is very limited).  This deference to arbitral awards "promotes the 'twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Kolel Beth,* 729 F.3d at 103 (internal citations omitted).

Section 207 of the Convention provides that:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration.  The court *shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

---

[16] This Court has subject matter jurisdiction pursuant to Section 203 of the Federal Arbitration Act.  9 U.S.C. § 203. IRB has not contested personal jurisdiction and in any event, IRB has submitted its own complaint against NICO and therefore has voluntarily submitted itself to personal jurisdiction.

(9 U.S.C. § 207) (emphasis added).

As stated in Section 207, confirmation of an arbitration award under the Convention is mandatory unless one of the specified grounds for the refusal or deferral of enforcement applies. Here, as the record reflects, none of the grounds for refusal under the Convention remotely applies, as such grounds are limited to: (1) incapacity of a party; (2) lack of notice; (3) resolution of a non-arbitrable dispute; (4) improper composition of the arbitration panel; (5) an award that is not binding; (6) subject matter of the arbitration that is not capable of settlement by arbitration under the law of the country where enforcement of the award is sought; or (7) a violation of public policy arising from recognition of the award.  *See* Article V of the Convention; *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 19 (2d Cir. 1997).

Likewise, none of the grounds to vacate, modify or correct the Awards under the FAA exists because the Awards were in no way the product of: (1) fraud or undue means; (2) evident partiality or corruption in the arbitrators; (3) arbitrator misconduct; (4) the arbitrators exceeding their powers; or (5) evident material miscalculation or mistake.  *See* 9 U.S.C. §§ 10(a)(1)-(4)-(11)(a).  The Awards were also not imperfect in form and do not concern matters that were outside the issues submitted by the parties to the arbitrators for a decision. *See* 9 U.S.C. (11)(b)-(c).

As the foregoing facts demonstrate, there is absolutely no basis to challenge Mr. Schmidt's participation as umpire in the arbitration, nor any basis to challenge the conduct of the arbitration, nor any basis to challenge the Panel's rulings and Awards.  Given IRB's recent change of counsel in the matter and the withdrawal of Mr. White's Dissent, NICO will not attempt to predict what IRB's challenges to the Awards may be.  Instead, NICO shall address any challenges in its reply papers.

## <u>CONCLUSION</u>

For the reasons set forth above, NICO respectfully requests that the Court enter judgment confirming the January 15, April 15 and May 15 Awards and grant such other relief as the Court may deem just and proper.

Dated:   July 14, 2015
         New York, New York

                                        Respectfully submitted,
                                        Clyde & Co US LLP

                         By:

                                        *s/ Michael A. Knoerzer*
                                        Michael A. Knoerzer
                                        michael.knoerzer@clydeco.us
                                        Stephen M. Kennedy
                                        stephen.kennedy@clydeco.us
                                        Gregory S. Hoffnagle
                                        gregory.hoffnagle@clydeco.us
                                        The Chrysler Building
                                        405 Lexington Avenue
                                        New York, New York 10174
                                        Phone:  (212) 710-3900
                                        Fax:  (212) 710-3950

                                        *Attorneys for Petitioner National Indemnity*
                                        *Company*