```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
NATIONAL INDEMNITY COMPANY,

                    Petitioner,

        - against -

IRB BRASIL RESSEGUROS S.A.,

                    Respondent.
---------------------------------X
```

**MEMORANDUM AND ORDER**

15 Civ. 3975 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


## I.   INTRODUCTION

This case arises out of a series of contentious arbitrations over a seven-year period between National Indemnity Company ("NICO") and IRB Brasil Resseguros S.A. ("IRB"), pertaining to NICO's alleged obligation to reinsure losses suffered by a Brazilian company in Brazil.  The arbitration tribunal, composed of two party-appointed arbitrators and one neutral umpire, issued three awards in NICO's favor, one in each of January, April, and May of 2015.

NICO has petitioned the Court to confirm the awards.  IRB has cross-petitioned the Court to vacate the awards, contending: first, that the umpire's revelation of his concurrent service in another arbitration and his subsequent refusal to withdraw in this case constitutes "evident partiality"; and second, that the

arbitration tribunal lacked the power to issue its second and third awards.  For the following reasons, NICO's petition to confirm the awards is granted, and IRB's cross-petition to vacate is denied.

## II.  BACKGROUND

### A.  Factual Background[1]

#### 1.  The Reinsurance Contracts and Arbitration Clauses

Companhia Siderurgica Nacional ("CSN") is a Brazilian mining and steelmaking conglomerate that owns and operates the TECAR coal terminal at the Port of Itaguai in Rio De Janeiro, Brazil.  NICO Pet. ¶ 3; IRB Mem. 1, 3.  CSN purchased insurance policies to cover the TECAR facility over three distinct periods between 2007 and 2009.  CSN's first insurance policy was in effect from January 21, 2007, to November 21, 2007, (the "Original Period")[2] and later extended to cover November 21, 2007, to February 21, 2008, (the

---

[1]    Unless otherwise noted, the facts recited here and throughout this Memorandum and Order are drawn from the following sources: (1) NICO's petition to confirm the arbitration awards ("NICO Pet."); (2) the declaration of Michael A. Knoerzer in support of NICO's petition ("Knoerzer Decl.") and the exhibits attached thereto; (3) IRB's memorandum of law in opposition to NICO's petition and in support of IRB's motion to vacate ("IRB Mem."); (4) the declaration of G. Richard Dodge, Jr. in support of IRB's opposition memo ("Dodge Decl.") and the exhibits attached thereto; (5) NICO's reply memorandum of law ("NICO Reply"); (6) the supplemental declaration of Michael A. Knoerzer in support of NICO's reply memo ("Knoerzer Suppl. Decl.") and the exhibits attached thereto; (7) IRB's reply memorandum of law ("IRB Reply"); and (8) the supplemental declaration of G. Richard Dodge, Jr. in support of IRB's reply memo ("Dodge Suppl. Decl.") and the exhibits attached thereto.  We also draw from our previous written opinions in a related case, as cited herein.

[2]    IRB alleges this insurance policy, and therefore the Original Period, began in November 2006, not January 2007.  IRB Mem. 3.  The start of the Original Period is immaterial to the instant dispute.

"Extension Period"). NICO Pet. ¶ 8. CSN's second insurance policy was in effect from February 21, 2008, to February 21, 2009, (the "Renewal Period"). NICO Pet. ¶ 11. CSN purchased these two policies from two insurance companies in the business of selling such "direct" insurance coverage.[3]

NICO, a Nebraska corporation, and IRB, a Brazilian corporation, are in the business of reinsurance.[4] NICO Pet. ¶¶ 1, 2. IRB reinsured a substantial portion of the direct policies issued to CSN, and NICO, in turn, provided "retro" coverage to IRB. The terms of NICO's obligations to IRB are listed in two retrocessional agreements: one covering the Extension Period (the "2007 Contract"), and another covering the Renewal Period (the "2008 Contract"). See Knoerzer Decl. Exs. 1, 2. NICO maintains that both contracts are valid, and therefore that NICO reinsured IRB for both the Extension and Renewal Periods. NICO Pet. ¶¶ 10, 12. IRB, however, disputes the validity of the 2008 Contract, and therefore claims NICO reinsured it for the Extension Period only,

---

[3]     The parties agree that Sul America Cia Nacional de Seguros ("Sul America"), a Brazilian insurance company, was the "direct" insurance company from whom CSN purchased the insurance policy covering the Original and Extension Periods. NICO Pet. ¶ 8; IRB Mem. 3. NICO alleges that "Mapfre Seguros," another Brazilian insurance company, was CSN's direct insurer for the Renewal Period. NICO Pet. ¶ 11. Neither direct insurer is a party to this case.

[4]     Reinsurance is insurance for insurance companies. In a reinsurance agreement, the reinsurer agrees to indemnify some or all of the risk associated with an existing insurance policy in exchange for payment of a premium. These agreements can be made not only between the direct insurer and a reinsurer, but also between two reinsurers via a "retrocessional" or "retro" agreement. In this way, the obligation to cover some underlying insurance policy can be transferred by contract from one reinsurer to a second reinsurer, a so-called "retrocessionaire." NICO Pet. ¶ 7.

and not the Renewal Period.[5]   IRB Mem. 3, 40.   The parties agree NICO did not provide reinsurance for the Original Period.

The undisputed 2007 Contract and disputed 2008 Contract between NICO and IRB were arranged by Catalyst Re Consulting, L.L.C. ("Catalyst Re"), a New Jersey-based reinsurance broker specializing in South America.   IRB Mem. 3; NICO Pet. ¶ 15 n.6. Both parties have submitted copies of the reinsurance placement slips memorializing these agreements and bearing their and Catalyst Re's names.   See Dodge Decl. Exs. A, B; Knoerzer Decl. Exs. 1, 2.   Pursuant to the 2008 Contract, NICO received a "premium share" of $9,114,240 (the "2008 Premium") directly from CSN.   See Knoerzer Decl. Ex. 2 at 6.   To summarize: the parties agree NICO did not reinsure IRB for the Original Period; they agree NICO did reinsure IRB for the Extension Period under the 2007 Contract; and they dispute whether NICO reinsured IRB for the Renewal Period under the 2008 Contract.   They do not dispute that NICO in fact received the 2008 Premium.

The 2007 and 2008 Contracts each contain the following arbitration provisions:

> If any dispute shall arise among the Reinsured and the Reinsurer with reference to the interpretation of this Insurance or rights with respect to any transaction involved, whether such dispute arises before or after

---

[5]   As discussed below, IRB disputes the validity of the 2008 Contract in order to argue that it did not agree to arbitrate issues arising with respect to the premium NICO received pursuant to that contract.   However, the arbitration panel ultimately concluded that NICO had reinsured IRB for the Renewal Period.

termination of this Insurance, such dispute, upon the written request of either party, shall be submitted to three arbitrators, one to be chosen by either party, and the third by the two so chosen. If either party refuses, or neglects to appoint an arbitrator within 30 days after receipt of written notice from the other party requesting it to do so, the requesting party may appoint two arbitrators. If the two arbitrators fail to agree in the selection of a third arbitrator within 30 days of their appointment, each of them shall name two, of whom the other shall decline one and the decision shall be made by drawing lots. All arbitrators shall be active or retired officers of insurance or reinsurance companies not under the control of either party to this certificate.

The arbitrators shall interpret this certificate as an honorable engagement and not as merely a legal obligation. They are relieved of all judicial formalities and may abstain from following the strict rules of law. They shall make their award with a view to effecting the general purpose of this certificate in a reasonable manner rather than in accordance with a literal interpretation of the language. Each party shall submit its case to the arbitrator within 30 days of the appointment of the third arbitrator.

The decision in writing of any two arbitrators when filed with the parties hereto, shall be final and binding on both parties. Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expenses of the third arbitrator and of the arbitration. Said arbitration shall take place in New York, N.Y. and under New York State law unless some other place is mutually agreed upon by the Reinsured and the Reinsurer.

Knoerzer Decl. Exs. 1 at 16, 2 at 19.

## 2.   The Property Loss and Arbitration Demands

In July 2008, CSN notified its direct insurer and IRB of its claim for a sizable property and business interruption loss (the

"CSN loss") related to a conveyer system for iron ore in its TECAR facility.  IRB Mem. 1, 3.  According to IRB, CSN identified December 1, 2007, as the date on which the loss first occurred.  Id. at 3.  This date of loss fell squarely within the Extension Period, for which NICO had undisputedly reinsured IRB.  On September 29, 2008, the reinsurance broker Catalyst Re sent NICO notice of IRB's claim.  Dodge Decl. Ex. D.  That notification indicated a "DOL" of "TBA" and described the "IRB LOSS" as: "TBA (eight to ten losses occurred between December 2007 and beginning of 2008)."  Id. at 2.

On December 31, 2008, NICO commenced two arbitrations against IRB: one in London, England ("Arbitration 1"), seeking a declaration that it had no coverage obligations with respect to the CSN loss under the 2007 Contract; and the other in New York City ("Arbitration 2"), seeking a declaration that it had no coverage obligations with respect to the CSN loss under the 2008 Contract.  See IRB-Brasil Resseguros S.A. v. Nat'l Indem. Co., No. 11 Civ. 1965 (NRB), 2011 WL 4686517, at *1 (S.D.N.Y. Oct. 6, 2011) ("IRB-Brasil I").

Arbitration 1 ended on November 16, 2010, when the arbitration panel determined it lacked jurisdiction and dismissed the proceeding.  Id.  That same day, NICO commenced a third arbitration against IRB in New York City ("Arbitration 3"), under the same 2007 Contract at issue in Arbitration 1.  Id.

### 3.   The 2011 Selection Disputes and this Court's Prior Opinions

In the meantime, starting in 2009, the parties began selecting the panel for Arbitration 2.  Id. at *2.  IRB appointed James White as its party-appointed arbitrator ("party-arbitrator"), and NICO appointed James Dowd as its party-arbitrator.  Id.  On September 15, 2009, each party nominated two candidates for the neutral third arbitrator ("umpire") position:  IRB nominated William Trutt and Jonathan Rosen, and NICO nominated Caleb Fowler and Daniel Schmidt. See IRB-Brasil Resseguros S.A. v. Nat'l Indem. Co., No. 11 Civ. 1965 (NRB), 2011 WL 5980661, at *1 (S.D.N.Y. Nov. 29, 2011) ("IRB-Brasil II").

In December of 2010, the parties began to select the panel for Arbitration 3.  Id. at *2.  IRB once again appointed James White as its arbitrator, and, in March of 2011, NICO appointed Jonathan Rosen -- one of IRB's two umpire candidates for Arbitration 2 -- as its party-arbitrator.  Id.

At this point, the selection process became contentious and twice resulted in cross-petitions seeking this Court's intervention.  These prior disputes involved the parties' efforts to disqualify each other's proposed nominees for arbitrator and umpire.  They were resolved by two written opinions of this Court, which we summarize here only in relevant part.

First, IRB sought a disqualification of Rosen as NICO's party-arbitrator in Arbitration 3, given that he was also one of IRB's umpire candidate in Arbitration 2.  Our first Memorandum and Order, dated October 5, 2011, declined IRB's disqualification request. IRB-Brasil I, 2011 WL 4686517, at *2–3.  In so ruling, we suggested that because NICO had chosen Rosen as its arbitrator in Arbitration 3, NICO could be considered to have struck him in Arbitration 2; that is, to have exercised its right under the arbitration clause to decline one of IRB's two umpire candidates.  Id. at *3.  We also declined to order consolidation of Arbitrations 2 and 3, leaving that decision to the arbitrators.  Id.  We concluded that "[w]e see no further barrier to the parties concluding the relatively straightforward process of selecting arbitrators in Arbitration 2 according to the terms of their agreement."  Id.

On October 11, 2011, proceeding under its understanding of our October 5 ruling, IRB sought to strike the NICO-nominated umpire candidate Caleb Fowler from consideration in Arbitration 2 and immediately draw lots to select an umpire from the two remaining candidates: Trutt (nominated by IRB) and Schmidt (nominated by NICO).  IRB-Brasil II, 2011 WL 5980661, at *2.  NICO objected to the immediate drawing of lots on the basis that Trutt had not yet completed an umpire questionnaire (concerning his

history as an arbitrator and potential conflicts of interest) that Schmidt had previously completed and submitted.[6]  <u>Id.</u>

Two days later, Dowd (NICO's party-appointed arbitrator in Arbitration 2) abruptly resigned, and NICO immediately sought to replace him with Rosen (who, at this point, was NICO's party-arbitrator in Arbitration 3 and effectively struck as IRB's umpire candidate in Arbitration 2).  <u>Id.</u>  It would later come to light that NICO had asked Dowd to resign.  <u>Id.</u>  Against this backdrop, the parties returned to the Court, filing cross-petitions regarding, <u>inter alia</u>, the umpire questionnaire dispute and the attempted replacement of Dowd with Rosen.

Our second Memorandum and Order, dated November 29, 2011: (1) declined to disallow NICO's directing James Dowd to resign and replacing him with Rosen; and (2) directed Trutt to complete the same questionnaire that Schmidt had completed should Trutt wish to continue as an umpire candidate.[7]  <u>Id.</u> at *4, *6.  We did not

---

[6]    Schmidt completed the questionnaire in December of 2009, when he was first informed he was a nominee for umpire.  NICO Pet. ¶ 18.  His responses to that questionnaire, a central issue in the current litigation, are discussed in detail below.

[7]    In the 2011 litigation, IRB, frustrated with perceived delay tactics by NICO, had taken the position that questionnaires were not required of umpire candidates and sought to immediately draw lots for umpire.  Conversely, NICO had argued that the parties orally agreed to give all umpire candidates questionnaires.  Based on an email authored by IRB's then-counsel, we concluded the parties agreed to modify the arbitration agreement such that each umpire candidate would submit a single questionnaire.  <u>IRB-Brasil II</u>, 2011 WL 5980661, at *6.

require Schmidt to update his two-year-old responses to the
questionnaire, a request that NICO had made[8] and IRB had opposed.[9]

At the end of our November 29 opinion, we admonished the
parties to proceed expeditiously with umpire selection in
Arbitration 2.  Id. at *7.  We also granted IRB's request to stay

---

[8]    In the briefing, NICO requested that the party-arbitrators solicit not
only a questionnaire response from Trutt, but also an updated response from
NICO's candidate Schmidt.  See Mem. of Law in Opp'n to Order to Show Cause and
In Supp. of Cross-Pet. to Disqualify Neutral Umpire Candidate at 4 n.2, IRB-
Brasil, No. 11 Civ. 1965 (NRB) (S.D.N.Y. Nov. 1, 2011), ECF No. 30 ("NICO 2011
Mem.") ("Although Mr. Schmidt had previously submitted an umpire questionnaire,
this occurred about two years ago.  NICO believes it would be appropriate for
Mr. Schmidt to update these disclosures.").  This request was consistent with
the request NICO previously submitted to the party-arbitrators by an email of
October 13, 2011.  See Knoerzer Decl. Ex. 43 ("NICO, consistent with industry
practice in reinsurance arbitrations, requests that you solicit responses to
the attached umpire questionnaire from candidates Daniel Schmidt and William
Trutt.").  However, elsewhere in its 2011 motion papers, NICO requested only
that Trutt be directed to answer the questionnaire.  See NICO 2011 Mem. at 19-
20.  And the additional request that Schmidt update his 2009 response was not
pursued in NICO's reply.  See Reply Mem. of Law in Opp'n to Order to Show Cause
and in Supp. of Cross-Pet. to Disqualify Neutral Umpire Candidate at 4-5, IRB-
Brasil, No. 11 Civ. 1965 (NRB) (S.D.N.Y. Nov. 10, 2011), ECF No. 39 ("[F]airness
dictates that an umpire questionnaire response should be obtained from Mr. Trutt
. . . before selection of an umpire in Arbitration 2.  IRB has received a
response from Mr. Schmidt, but NICO has not received one from Mr. Trutt.").
Ultimately, the issue of updating Schmidt's disclosures went unmentioned in our
November 29 decision.

[9]    IRB's position was that, pursuant to industry custom and practice, the
proper time for an umpire's disclosures was at the post-selection organizational
meeting.  See Mem. of Law in Supp. of IRB-Brasil Resseguros S.A.'s Mot. to
Compel Arbitr'n In Compliance With the Arbitr'n Agreement and for Further Relief
at 15-18, IRB-Brasil, No. 11 Civ. 1965 (NRB) (S.D.N.Y. Nov. 8, 2011), ECF No.
33; Tr. of Conf. Held Oct. 21, 2011 at 17:4-9, IRB-Brasil, No. 11 Civ. 1965
(NRB) (S.D.N.Y. Dec. 6, 2011), ECF No. 41 ("In the ordinary course you have an
organizational meeting.  At the organization meeting you have a panel[,] that's
what happens after you flip the coin.  At the organization meeting the umpire
whomever he or she is makes disclosures as can be asked questions about their
background.  That happens in every single case."); id. at 19:5-14, ("[T]his is
something that takes place after the arbitration is closed.  At this stage there
is nothing in the agreement that calls for . . . questionnaires.  What we would
like to have happen is the coin toss.  [The party-arbitrators] should toss a
coin, determine who is the umpire in Arbitration [2].  They can make their
requests of whoever it is because we don't even know it will be Mr. Trut[t] at
this stage and he can answer and respond at the organization meeting just like
happens at every one of those arbitrations.").

Arbitration 3 until the panel in Arbitration 2 rendered a decision on whether the two arbitrations should be consolidated.  Id.  Thereafter, Mr. Trutt submitted a response to the questionnaire, and the parties randomly selected Schmidt as umpire in Arbitration 2.  NICO Pet. ¶ 31.  Thus, the panel in Arbitration 2 -- of Schmidt as umpire, White as IRB's party-arbitrator, and Rosen as NICO's party-arbitrator -- ("the Panel") was set.

### 4.  Daniel Schmidt's 2009 Questionnaire

In 2009, at the time Schmidt was first nominated as an umpire candidate in Arbitration 2, he was sent and completed an "umpire questionnaire" seeking information on his qualifications and potential conflicts of interest.  NICO Pet. ¶ 18.  Schmidt's completed questionnaire, dated December 16, 2009, detailed his extensive experience in the field of reinsurance arbitration and his past work with the lawyers and parties participating in this matter.  Knoerzer Decl. Ex. 3.  Among other things, Schmidt disclosed:

- His past service on more than 345 reinsurance arbitration panels: over 115 as umpire and over 230 as a party-appointed arbitrator;

- That he was not and had never been an employee, officer, director, shareholder, agent, or consultant for any of the parties or their subsidiaries, affiliates, or parent companies, and that neither he nor any company with which he was affiliated had a business relationship with any of these entities over the past three years;

- His participation in 25 past arbitrations involving General Re Corporation[10] or a Gen Re subsidiary: 11 as umpire, 13 as party-arbitrator "for", and 1 as party-arbitrator "against";

- His service as umpire in 1 past arbitration involving IRB;

- His participation as arbitrator or umpire in matters involving NICO's counsel Michael Knoerzer: three times as umpire, once as party-arbitrator "for", once as party-arbitrator "against";

- That he was not aware of any other facts or circumstances that might "create an appearance of partiality on your part in the above-captioned arbitration."

Id. at 2-4.  It is undisputed that, at the time it was submitted, Schmidt's questionnaire answers were accurate.

### 5.  Schmidt's 2012 Disclosures and his Decision not to Withdraw

On January 3, 2012, Schmidt was informed that he had been selected as umpire.  Knoerzer Decl. Ex. 6, at 2.  On that day, he emailed counsel for IRB and NICO and promised to provide "an updated disclosure within the next day or two."  Id.  Two days later, by email dated January 5, 2012, he wrote to "supplement and update [his] December 16, 2009 disclosures."  Id. at 1.  Schmidt made the following additional disclosures:

- He had been named in fifteen new arbitrations: five as umpire, five by the ceding company, and five by the assuming company;

- He had had overlapping service on arbitration panels with Jonathan Rosen, including matters that were either recently resolved or currently "on hold";

---

[10]     General Re Corporation ("Gen Re") is an affiliate of NICO.  Both are subsidiaries of Berkshire Hathaway, Inc. ("Berkshire").  NICO Pet. ¶ 20 n.7.

- He had taken a new assignment as party-arbitrator from NICO's counsel: "Michael Knoerzer/Clyde & Co – appointed as arbitrator by Michael's client, Lloyd's/Equitas in 3/11; this matter is active, but there has been no ex parte for many months due to a pending SJ motion."

- He had taken a new assignment as an expert witness from IRB's then-counsel: "Aidan McCormack/DLA Piper – asked to serve as an expert in connection with an AAA arbitration and provided my written opinion in that matter in 12/10; it is possible that my role has not ended, but I have not discussed with matter with Aiden for over a year."

Id. Schmidt concluded his January 5 email by stating: "I remain confident that I would serve as an impartial umpire in this matter and would be happy to answer any questions."  Id.

On January 9, 2012, IRB's then-counsel responded to Schmidt's updated disclosure, arguing that Schmidt's newly disclosed appointment as party-arbitrator for "Lloyds/Equitas"[11] in another pending arbitration (the "Equitas arbitration") should disqualify him from serving as umpire in this case, and that he should withdraw from the IRB-NICO arbitration.  Knoerzer Decl. Ex. 9.

The import of the relationship between NICO and Equitas remains disputed.  There is no debate that NICO has reinsured Equitas for the immense sum of $7 billion as part of a 2007–2010

---

[11]    Equitas Holdings Limited ("Equitas") is a United Kingdom-based company organized to reinsure certain liabilities that had accumulated in the Lloyd's of London group of companies on policies written between 1930 and 1992.  Between 2007 and 2010, Equitas completed a transaction with NICO, in which, among other things: (1) NICO reinsured Equitas's obligations up to a total of $7 billion; and (2) NICO acquired Equitas's management services company, Equitas Management Services Limited, and renamed it Resolute Management Services Limited.  Resolute Management Services, which operates in the same offices and with the same staff as the former Equitas Management Services, manages the run-off of Equitas's obligations, and NICO covers the cost of running Resolute.  See Equitas Holdings Limited Annual Report & Financial Statements 2015 at 2–3, Dodge Decl. Ex. N.

transaction; that Equitas currently has only one employee (its CEO), with all others "transferred" to Resolute Management Services ("Resolute"), a Berkshire Hathaway subsidiary and NICO affiliate; and that Resolute manages the run-off of the reinsured policies held by Equitas.  See IRB Mem. 8-9.  NICO and Equitas also had the same attorney representing them in the two arbitrations.  At same time, Equitas is incorporated as an independent company in the United Kingdom with its own board of directors, and there is no evidence that NICO (or any Berkshire Hathaway subsidiary) holds a direct ownership interest in Equitas. See NICO Pet. ¶ 34.  Finally, it is undisputed that the Equitas arbitration and the NICO-IRB arbitration are not factually related.

On January 17, 2012, Schmidt requested the parties make written submissions on the matter of his alleged partiality due to the newly-disclosed Equitas arbitration; later, he requested a reply and sur-reply, writing: "I am particularly interested in learning more about the apparent decision by the parties to forego obtaining a supplemental questionnaire from the remaining candidates before the random selection process occurred." Knoerzer Decl. Ex. 10.  The parties briefed the issues, raising arguments similar to those before the Court today.  See Knoerzer Decl. Ex. 11; Dodge Decl. Ex. P.  By email of January 25, Schmidt informed the parties that he had decided to proceed as umpire and

promised to "respond to the submissions soon." Knoerzer Decl. Ex. 13.

On February 25, two days before a scheduled pre-hearing organizational meeting, Schmidt issued a "status report" discussing, among other things, his reasons for not withdrawing as umpire:

> I find it necessary to state that in nearly 400 appointments since 1987, I have never considered myself and have never been "employed" or "hired" by the appointing party or its counsel; neither have I ever referred to or viewed the appointing party as "my client"; neither have I ever viewed myself or acted as a "hired gun". Instead, I am retained as an arbitrator or umpire and function independently.
>
> . . . I do not know and do not believe I have ever met or even talked with anyone from NICO. The same is true for IRB personnel. . . . Invariably, my contacts are with counsel and all contacts are professional and certainly not employer-employee, or principal-agent, or master-servant. . . .
>
> . . . . In sum, I function independently in every case, and every case is handled independently from every other case. Both parties can expect and will receive a fair and just process and result in this case.

Dodge Decl. Ex. R., at 2-3. Schmidt also confirmed, at NICO's request, that there had been no ex parte communications between himself and NICO or its counsel regarding the NICO-IRB arbitration. Id. at 2.

The pre-hearing organizational meeting was held on February 27, 2012, at the offices of IRB's former counsel in New York. See Dodge Decl. Ex. T, at 1. At the organizational meeting the parties

agreed to consolidate Arbitrations 2 and 3.  IRB Mem. 11.  Thus, NICO's obligations under the 2007 and 2008 Contracts would both be resolved by the Panel of Schmidt, Dowd, and Rosen.

### 6.   2012: The Arbitration is Stayed Pending Settlement of Underlying Litigation in Brazil

In July of 2012, at a transcribed hearing before the Panel, IRB's counsel stated that IRB had not taken a position on the date of the CSN loss, and that the issue would be resolved as part of a pending litigation between IRB and CSN in Brazil.  Knoerzer Decl. Ex. 14, at 50:13-22.  The appropriate date of loss was a crucial issue in the arbitration because NICO's reinsurance obligations were limited to losses occurring in the Extension Period (under the 2007 Contract) and the Renewal Period (under the 2008 Contract).  With the Panel's approval, the parties agreed to stay the arbitration pending resolution of the coverage litigation in Brazil.  NICO Pet. ¶ 44.

### 7.   2013: The Underlying Litigation is Settled, the Parties Debate

In November of 2013, CSN, Sul America, and IRB settled the litigation in Brazil for a total of $168,000,000, of which IRB would pay CSN $167,391,030.33.[12]  Dodge Decl. Ex. U, at 5, 8.  IRB informed NICO of the settlement five months later, by letter dated

---

[12]   It appears IRB made this payment, but other reinsurers to whom IRB had ceded portions of the risk associated with CSN's Extension Period policy in turn reimbursed IRB for about $130 million of this amount.  See Knoerzer Decl. Ex. 44, at 5.

March 11, 2014.   Knoerzer Decl. Ex. 16.   In that letter, IRB requested a total of $41,364,857.81 from NICO as NICO's required contribution to the settlement pursuant to the 2007 Contract.   Id. The March 11 letter did not contain a copy of the settlement agreement.   Id.   And although the settlement agreement itself did not state a date of loss, the March 11 letter from IRB to NICO identified December 1, 2007, as the date of loss, placing the loss within the Extension Period.   Id.

NICO responded to IRB's March 11 letter with its own letter of March 13, 2014, requesting from IRB documentation to support the requested $41 million "cash claim."   Knoerzer Decl. Ex. 18. In particular, NICO requested: (1) a copy of the signed settlement agreement between IRB, Sul America, and CSN; (2) confirmation and explanation of the purported December 1, 2007, date of loss as well as of IRB's determination that the loss occurred as a "single occurrence" on that day; and (3) confirmation that IRB is the reinsured in the 2008 Contract and will not present a claim under that contract.   Id.   Apparently unsatisfied with IRB's initial response, NICO requested that the arbitration Panel compel responses on these topics, a request that IRB opposed.   NICO Pet. ¶ 52.

By email dated May 31, 2014, the Panel unanimously ruled that IRB must provide, among other things, "an explanation for the December 1, 2007 as the Date of Loss (DOL), given that incidents

17

of the type covered in the settlement occurred many months in advance of the DOL and the November 21, 2007 inception date of the 'Extension Period' (as well as many months afterwards)" and "an explanation for the single occurrence presentation."   Knoerzer Decl. Ex. 19.

The parties and Panel subsequently exchanged a number of letters, pre-hearing evidence submissions, motions, and rulings regarding, among other things: evidence on the date of loss, whether the loss was appropriately characterized as a "single occurrence" on one day, and the affidavits and availability of certain witnesses located in Brazil.  See Knoerzer Decl. Exs. 20–25.

### 8.   The "Secret Side Deal"

At the same time it settled the Brazilian litigation, CSN and IRB entered into another agreement, which NICO provocatively calls the "secret side deal."[13]   NICO Pet. ¶ 48; see Knoerzer Decl. Ex. 17.  The CSN-IRB agreement was dated November 27, 2013.  Knoerzer Decl. Ex. 17, at 4.  Under the agreement, IRB and CSN agreed to take the position, with retroactive effect, that IRB had reinsured CSN for the 2008-2009 period, but had never ceded the CSN-related

---

[13]   According to NICO, IRB did not reveal the existence of this side deal to NICO or the Panel at the time they informed them of the settlement of the underlying Brazilian litigation.  NICO Pet. ¶ 50.  Instead, IRB provided only a Portuguese language copy of the agreement, without translation, within a 200,000 page document production.  Id.  NICO claims it first learned about the side deal in August 2014 while deposing IRB's witnesses.  Id.

risk to an international reinsurer (a position inconsistent with the 2008 Contract, which describes just such a transaction with NICO). Id. at 3.  IRB also agreed to cooperate with CSN's efforts to recover any premium paid to international insurers for this period under CSN's reinsurance program.  Id.  In turn, CSN renounced its claim to coverage for any damages over the 2008–2009 period.[14]  Id.

**9.   The Arbitration Hearing**

The Panel held its hearing in New York in November of 2014. In its pre-hearing brief, NICO asked the panel to issue an award:

> (1) Denying IRB's March 11, 2014 "cash claim" against NICO under the 2007 Contract in its entirety with prejudice;

> (2) Declaring that NICO shall have no liability to IRB or any other entity under either the 2007 Contract or the 2008 Contract and is further not obliged to return the premium under either contract;

> (3) Declaring that IRB shall indemnify and hold NICO harmless in the event CSN or any other entity asserts a claim or seeks any type of relief whatsoever against NICO in connection with the 2008 Contract;

> (4) . . . ; and

> (5) Ordering IRB to reimburse NICO for all of its attorneys' fees and costs incurred in connection with this arbitration.

Knoerzer Decl. Ex. 27, at 80.  IRB, on the other hand, sought from the Panel a ruling that NICO was bound to reinsure its share of

---

[14]    IRB explains that its agreement with CSN was intended to settle CSN's pending appeal of a Brazilian appellate court's ruling that IRB had not reinsured CSN in the Renewal Period.  IRB Mem. 11–12.

the CSN loss under the 2007 Contract as well as IRB's attorney's fees. Knoerzer Decl. Ex. 44, at 119. IRB sought no affirmative relief with respect to the 2008 Contract. However, IRB made numerous references -- in its pre-hearing brief,[15] during its opening statement,[16] during the testimony of the reinsurance broker Catalyst Re,[17] and during its summation[18] -- to the fact that NICO had in fact reinsured IRB for the Renewal Period, the period covered by the 2008 Contract. At these times, IRB did not challenge the validity of the 2008 Contract or argue that the panel lacked jurisdiction to hear NICO's request for relief under the 2008 Contract.

The principal factual issue in the arbitration was the date of CSN's loss, and, specifically, whether it was reasonable to allocate the loss to the Extension Period. NICO argued the

---

[15] See Knoerzer Decl. Ex. 44, at 1 n.1 ("NICO was also the lead retrocessionaire for CSN's so-called 'renewal' insurance program, assuming $189.68 million in risk."); id. at 5 ("IRB also went to extraordinary lengths to protect the $189M+ risk NICO assumed in the so-called 'renewal' period"); id. at 98 ("[O]n or about February 21, 2008, NICO agreed to participate on the 2008-2009 Retrocession, assuming approximately $190 million in risk across multiple layers."); id. at 107 ("Jerome Halgan (the former NICO underwriter who wrote the Extension and the 2008-2009 CSN reinsurance programs) . . . .").

[16] See Knoerzer Decl. Ex. 42 at 183:15-21 ("Truthfully, if IRB really wanted to go out of its way to harm NICO, it would have put this loss right in the renewal where its exposure would have been $91 million.").

[17] See Knoerzer Decl. Ex. 5 at 944:17-20 ("Q: Do you believe today that you did place reinsurance protection for IRB for the 2008-2009 year with NICO? A: Yes.").

[18] See Knoerzer Decl. Ex. 28, at 1521:8-13 ("The related settlement agreement [between IRB and CSN] for the renewal litigation further protected the market, further protected NICO with CSN's agreement that there was no loss in that period. We took that absolutely out of play.").

December 1, 2007 date of loss was unreasonable, based on (1) evidence that the damage to CSN's conveyer belt manifested prior to December 1, and indeed prior to November 21, 2007 (the start of the Extension Period); and (2) evidence suggesting that the treatment of the loss as a "single occurrence" -- that is, all occurring on December 1, as opposed to multiple events over multiple days -- was unreasonable. Knoerzer Decl. Ex. 27, at 55–65. IRB responded that (1) the evidence was sufficient to show a December 1, 2007 allocation was reasonable; and (2) that therefore NICO was obligated under New York law[19] to honor the terms of IRB's settlement with CSN, which characterized the CSN loss as a single occurrence on that day. Knoerzer Decl. Ex. 44, at 14–60.

The week-long November 2014 hearing produced a record of over 450 exhibits admitted into evidence, the testimony of seven witnesses, and a transcript of 1,740 pages. NICO Pet. ¶ 65. On the final day of the hearing, the parties agreed to close the record.

---

[19]   The "follow the settlements" or "follow-the-fortunes" doctrine requires a reinsurer "to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation." British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 85 (2d Cir. 2003). The rationale behind the rule is that an insurer and reinsurer have aligned interests in settling the underlying claim as cheaply as possible, and that a first reinsurer's good faith but unsuccessful efforts to dispute coverage could be used against it, creating a chain of complex, inefficient litigation that courts may be poorly equipped to resolve. See U.S. Fid. & Gaur. Co. v. Am. Re-Ins. Co., 20 N.Y.3d 407, 419–421, 985 N.E.2d 876, 881–83 (2013). Under this rule, a reinsurer must follow the settlement's allocation of the claim, including the assigned date of loss, unless that allocation is not objectively reasonable. Id.

**10.  CSN Demands a Return of the 2008 Premium from NICO**

On November 26, 2014, two weeks after the hearing ended but before the Panel issued any award, CSN wrote to NICO demanding the return of the 2008 Premium: the approximately $9 million payment NICO received under the 2008 Contract.  Id. ¶ 66.  CSN cited the IRB-CSN "side deal" as evidence of the fact that IRB never arranged reinsurance with NICO for the Renewal Period.  Id. ¶ 67.  NICO requested the Panel reopen the record for the purpose of admitting CSN's demand into the record.  Id. ¶ 68.  The Panel (by a majority) would later allow this by an order of February 14, 2015.  Knoerzer Decl. Ex. 29, ¶ 3.  Whether NICO was entitled to the 2008 Premium, and, more specifically, whether IRB was obligated to indemnify NICO against CSN's claim for the return of the 2008 Premium, thus took center stage as a main issue in the arbitration.

**11.  The Panel's Awards**

The Arbitration panel issued three awards in this case.

> a)  The Panel's First Award (Date of Loss)

On January 15, 2015, the Panel published a 12-page, single-spaced written decision entitled "FINAL DECISION (Re: Reasonableness of Allocation)."  Knoerzer Decl. Ex. 30.  By a majority of Schmidt and Rosen, the Panel held that IRB's allocation of its settlement with CSN to the 2007 Extension Period was unreasonable; therefore, NICO was not liable to IRB for any portion of the CSN loss.  Id.  ¶¶ B.25–26.  The Panel concluded:

> After thoroughly reviewing the record, the Panel by majority concluded that IRB failed to carry its (minimal) burden of demonstrating by a preponderance of the evidence that its allocation was objectively reasonable. IRB's only documentary evidence that dealt with a DOL of December 1, 2007 (or an allocation of the loss to the extension period) was from 2008, shortly after the loss was first discussed with CSN. There was no evidence presented by IRB of any persuasive value that supported the continuation of a December 1, 2007 DOL (or extension period allocation) after 2008, or that countered the 2009 and 2010 documents from CSN, SUL, IRB, and their claim consultants that clearly showed that the date of loss could not be maintained in the extended policy period. [Instead, if the evidence presented shows anything, it is that the settled loss should have been allocated in the original policy period.]

Id. ¶ B.25 (brackets in original).

Additionally, the Panel retained jurisdiction over any award of costs and over the issue of the 2008 Premium. Id. ¶¶ E.4, F.3. The Panel wrote that, should the parties be unable to resolve the issue of costs on their own, it intended to finalize the costs issue by March 31, 2015. Id. ¶ E.5. With respect to the 2008 Premium, the Panel explained:

> 1. Based on what it called the "side agreement" between IRB and CSN, NICO argues that it potentially could be subject to an action by CSN against it for the recovery of premiums or other "overpayments", and seeks from this panel (a) a declaration that NICO has no liability to anyone under their renewal retro coverage and has no liability to return any premiums, and (b) a ruling that IRB must hold NICO harmless for any liability arising under their renewal retro coverage.

> 2. The [P]anel does not believe that it has grounds to grant NICO's requests, with the record virtually empty regarding the renewal retro contract.

> 3. However, the [P]anel will retain jurisdiction
> regarding the 2008 renewal retro coverage until January
> 22, 2015 to allow the parties to discuss this subject
> further and to determine if there is anything that they
> can jointly request from this Panel regarding the
> renewal period issues. If by January 22, 2015 there is
> no joint request, or if a request of any kind is made by
> that date and the [P]anel does not decide to act on it,
> the [P]anel's jurisdiction regarding the 2008 renewal
> period shall end on January 22, 2015 without further
> notice.

Id. ¶¶ F1–3.

By email dated January 22, 2015, IRB wrote to the Panel that the parties were unable to resolve the issue of costs or agree on a joint request regarding the 2008 Premium. Knoerzer Decl. Ex. 31. At this time, IRB objected to the Panel's jurisdiction over the issue, and in the alternative requested a briefing schedule "[i]f the Panel nonetheless elects to entertain this dispute." Id. The same day, NICO submitted a brief outlining the relief it sought relating to the 2008 Contract, specifically requesting an award confirming that NICO is entitled to the 2008 Premium and requiring IRB to indemnify NICO for any liability arising out of that coverage. Knoerzer Suppl. Decl. Ex. 48. In February of 2015, the Panel directed the parties to continue briefing the issue with opposition and reply memoranda, which were submitted on March 6 and 13, respectively. See Knoerzer Suppl. Decl. Exs. 49–50.

b)   The Panel's Second Award (2008 Premium)

On April 15, 2015, the Panel by a majority issued a ruling confirming it had jurisdiction over NICO's request for relief under

the 2008 Contract and concluding that: (1) IRB was reinsured by NICO under the 2008 Contract; (2) NICO was entitled to keep the premium under the 2008 Contract; and (3) IRB must indemnify NICO for any claim asserted by CSN for the premium paid under the 2008 Contract.  Knoerzer Decl. Ex. 32.  The Panel also awarded NICO certain fees and costs, and retained jurisdiction to enforce the award.  Id.

c)  The Dissent

On April 16, 2015, IRB's party-arbitrator James White published an email to the other two panel members and the parties' counsel, attaching, without description or explanation, a document entitled "Dissent."  Knoerzer Decl. Ex. 33.  The attachment was a scathing 6-page, single-spaced opinion objecting to the Panel's first and second awards and accusing the other Panel members of bias in favor of NICO and of substantial, intentional errors of fact and law.  Id.  In particular, the dissent urged that "[t]he Umpire's decision and the legitimacy of this arbitral process require careful scrutiny by the court."  Id. at 4 (emphasis in original).  The next day, IRB filed a copy of the dissent in this Court in support of its motion to vacate the January 15 award.  See Suppl. Decl. of Robert C. Santoro, Ex. 2, Nat'l Indem. Co. v. IRB Brasil Resseguros, S.A., No. 15 civ. 1165 (NRB), ECF No. 43.

The unannounced dissent by White -- who according to NICO had never once issued a written opinion over the three-year-long

arbitration despite many split decisions, NICO Pet. ¶ 78 -- surprised the Panel and aroused its suspicions.  In an email dated April 17, Schmidt wrote: "comparing the clearly written (although inaccurate) dissent with the manner in which [M]r. [W]hite has communicated within the panel over the past three years, [I] can only surmise that he was not the (sole) author."  Knoerzer Decl. Ex. 40, at 2.  NICO claims the other two arbitrators asked Mr. White to confirm whether he actually wrote the dissent, but that White refused to answer.  NICO Pet. ¶ 80.

By letter dated May 1, 2015, NICO's counsel asked IRB's former counsel to confirm it had no role in preparing the dissent.  NICO Pet. ¶ 81.  By letter dated May 11, 2015, IRB's former counsel admitted they had communicated on an ex parte basis with White, provided him copies of documents from the record and transcript citations, and "provided him with a template draft dissent for his consideration."  Knoerzer Suppl. Decl. Ex. 52.  However, IRB's former counsel maintained that White initiated the communication unsolicited and claimed he requested assistance in preparing a dissent given "his concern that the Panel, and in particular the Umpire" were biased in favor of NICO.  Id.  On the same day, IRB's former counsel submitted a letter to this Court withdrawing the dissent from our docket.  See 15 Civ. 1165, ECF No. 47.

By email dated May 14, 2015, a majority of the Panel modified its standing confidentiality order "to authorize the parties,

counsel, and the panel members to use the Arbitration Information in any court, arbitral, or any other proceeding involving any of them." Knoerzer Decl. Ex. 37.

### d)   The Panel's Third Award (Fees and Costs)

On May 15, 2015, the Panel, by majority, issued its third and final award ordering IRB to pay NICO's fees and costs of $2,524,486.40, ordering discovery of IRB's written communications with White, and suspending the prohibition on ex parte communications for the party-appointed arbitrators. Knoerzer Decl. Ex. 38. The Panel explained it found these rulings necessary "[d]ue to circumstances stated in the record involving IRB's counsel . . . and its arbitrator, James P. White, and concerns over the manner in which IRB is conducting itself." Id.

On June 11, 2015, the Panel relinquished its jurisdiction over the arbitration. Knoerzer Decl. Ex. 39.

## B.   Procedural Background

The parties filed four actions in this Court pertaining to the Panel's awards. NICO filed three actions, one to confirm each of the Panel's January 15,[20] April 15,[21] and May 15[22] awards shortly after each was awarded. IRB filed a complaint seeking to vacate the January 15 award and claiming a breach of the arbitration

---

[20]   Nat'l Indem. Co. v. IRB Brasil Resseguros, S.A., No. 15 Civ. 1165 (NRB).

[21]   Nat'l Indem. Co. v. IRB Brasil Resseguros, S.A., No. 15 Civ. 3310 (NRB).

[22]   Nat'l Indem. Co. v. IRB Brasil Resseguros, S.A., No. 15 Civ. 3975 (NRB).

contact.[23]   Of these four actions, each except for NICO's final petition was initially filed under seal.

We accepted all four cases as related to each other and to the earlier 2011 litigation between the parties.  On June 8, 2015, IRB's former counsel withdrew and was replaced by its current counsel.  See 15 Civ. 3310 (NRB), ECF No. 6.  An initial pretrial conference was held on June 8, 2015.  On June 24, 2015, we ordered the three sealed actions unsealed.  See 15 Civ. 3975 (NRB), ECF No. 9.  We also ordered NICO to file a consolidated amended petition in one of its three actions to address all three arbitration awards, and to dismiss the two other actions.[24]  Id.

The parties briefed all disputed issues on this docket, numbered 15 Civ. 3975, as follows: on July 14, 2015, NICO filed an amended petition to confirm all three arbitration awards; on August 8, IRB filed its motion to vacate the awards and a consolidated opposition brief; NICO opposed IRB's motion by memorandum dated August 31; and IRB replied on September 14.  Oral argument was held on January 6, 2016.  Additionally, IRB submitted an unauthorized five-page letter of January 15, addressing matters that arose at oral argument.  NICO responded by letter dated January 19.

---

[23]   IRB Brasil Resseguros S.A. v. Nat'l Indem. Co., No. 15 Civ. 2939 (NRB).

[24]   Since then, NICO has failed to dismiss its other two actions.  As ordered below, the Court today dismisses the duplicative actions as moot.

## III. <u>DISCUSSION</u>

### A.   Review of Arbitral Awards

#### 1.   The FAA and the New York Convention

Both the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 <u>et seq.</u>, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), executed at 9 U.S.C. §§ 201 <u>eq seq.</u>, are implicated in this case: the FAA because the arbitral awards were entered in the United States, and the New York Convention because one of the parties (IRB) is a foreign corporation. <u>See</u> <u>Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.</u>, 668 F.3d 60, 71 (2d Cir. 2012) ("<u>Scandinavian Re</u>"); <u>Zeiler v. Deitsch</u>, 500 F.3d 157, 164 (2d Cir. 2007).  At oral argument, the parties agreed that they rely solely on the provisions of the FAA in their efforts to confirm or vacate the awards.  Tr. 2:25–3:4 Jan. 6, 2016, ECF No. 33 ("Oral Arg. Tr.").  Neither party disputes that, because the parties agreed to arbitrate in New York and did in fact conduct the arbitration in New York, the Court has subject matter jurisdiction and personal jurisdiction.  <u>See</u> 9 U.S.C. §§ 9, 203.

#### 2.   Standard of Review

"The role of a district court in reviewing an arbitration award is 'narrowly limited.'"  <u>Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust</u>, 729 F.3d 99, 103 (2d Cir.

2013) (quoting <u>Tempo Shain Corp. v. Bertek, Inc.</u>, 120 F.3d 16, 19 (2d Cir. 1997)).  Although the FAA empowers the court to "confirm and/or vacate the award, either in whole or in part . . . a petition brought under the FAA is not an occasion for <u>de novo</u> review of an arbitral award," <u>Scandinavian Re</u>, 668 F.3d at 71 (internal quotation marks omitted), nor an occasion for the court to conduct a "reassessment of the evidentiary record," <u>Wallace v. Buttar</u>, 378 F.3d 182, 193 (2d Cir. 2004).  Instead, "arbitration panel determinations are generally accorded great deference under the FAA." <u>Tempo Shain</u>, 120 F.3d at 19; <u>see</u> <u>Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC</u>, 497 F.3d 133, 138 (2d Cir. 2007) ("This Court has repeatedly recognized the strong deference appropriately due arbitral awards and the arbitral process, and has limited its review of arbitration awards in obeisance to that process.").  The purpose of such deference is to vindicate the "twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation." <u>Kolel Beth</u>, 729 F.3d at 103 (internal quotation marks omitted).

The burden of proving that an arbitral award must be vacated rests on the party seeking vacatur, who "'must clear a high hurdle.'" <u>Scandinavian Re</u>, 668 F.3d at 72 (quoting <u>Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.</u>, 559 U.S. 662, 671 (2010)); <u>see</u> <u>Wallace</u>, 378 F.3d at 189 (party seeking vacatur under FAA bears "heavy burden").  "[A] district court will enforce the award as

30

long as 'there is a barely colorable justification for the outcome reached.'"   <u>Kolel Beth</u>, 729 F.3d at 103-04 (quoting <u>Rich v. Spartis</u>, 516 F.3d 75, 81 (2d Cir. 2008)).

   **3.   Grounds to Confirm or Vacate Under the FAA**

   Under the FAA, "any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title."   9 U.S.C. § 9.   A district court may vacate an arbitral award in four circumstances:

>   (1) where the award was procured by corruption, fraud, or undue means;
>
>   (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
>   (3) where the arbitrators were guilty of misconduct . . . or of any other misbehavior by which the rights of any party have been prejudiced; or
>
>   (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).   Additionally, the court may modify the award under certain circumstances, including when "the arbitrators have awarded upon a matter not submitted to them."   9 U.S.C. § 11(b).

**B.   Schmidt's Alleged Partiality**

   IRB's principal argument for vacatur of the Panel's awards is that Schmidt's allegedly untimely disclosure of his role as party-

arbitrator in the Equitas arbitration, and his refusal to withdraw as umpire in the NICO-IRB arbitration, constitute "evident partiality" under the FAA.

**1.  Governing Law**

    a)  <u>Evident Partiality</u>

"In this Circuit, 'evident partiality within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'" <u>Scandinavian Re</u>, 668 F.3d at 72 (quoting <u>Morelite Constr. Corp. v. N.Y.C. Dist. Council Carpenters Benefits Funds</u>, 748 F.2d 79, 84 (2d Cir. 1984)).  "Unlike a judge, who can be disqualified in any proceeding in which his impartiality <u>might</u> reasonably be questioned, an arbitrator is disqualified only when a reasonable person, considering all of the circumstances, would <u>have</u> to conclude that an arbitrator was partial to one side." <u>Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.</u>, 492 F.3d 132, 137 (2d Cir. 2007) (emphasis in original) (internal quotation marks and citations omitted).  In setting out this standard, the Second Circuit noted the "trade-off between expertise and impartiality" and the "voluntary nature of submitting to arbitration," and therefore determined evident partiality to require more than the mere "appearance of bias." <u>Morelite</u>, 748 F.2d at 83-84.  At the same time, "proof of actual bias," an "insurmountable" standard, is not needed.  <u>Id.</u> at 84.

The burden to show evident partiality "'rests upon the party asserting bias.'" <u>Scandinavian Re</u>, 668 F.3d at 72 (quoting <u>Andros Compania Maritima, S.A. v. Marc Rich & Co.</u>, 579 F.2d 691, 700 (2d Cir. 1978)).   To evaluate an arbitrator's alleged partiality, courts employ a case-by-case approach.   <u>Lucent Techs. Inc. v. Tatung Co.</u>, 379 F.3d 24, 28 (2d Cir. 2004).   However, courts have emphasized a set of helpful, nonexclusive factors to guide the application of evident partiality test in the context of a purportedly disqualifying conflict:

> "(1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding."

<u>Scandinavian Re</u>, 668 F.3d at 74 (quoting <u>Three S Del., Inc. v. Dataquick Info. Sys., Inc</u>., 492 F.3d 520, 530 (4th Cir. 2007)). Notably, "adverse rulings alone rarely evidence partiality." <u>Id.</u> at 75.

### b)   <u>Nondisclosure of Conflicts</u>

Questions of evident partiality unsurprisingly arise in the context of an arbitrator's failure to disclose an allegedly disqualifying conflict.   "Among the circumstances under which the evident-partiality standard is likely to be met are those in which an arbitrator fails to disclose a relationship or interest that is strongly suggestive of bias in favor of one of the parties."

33

Scandinavian Re, 668 F.3d at 72.   However, courts are generally hesitant to vacate arbitration awards on the basis on nondisclosure alone.   Id.   ("[W]e have repeatedly cautioned that we are not 'quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information.'" (quoting Lucent Techs., 379 F.3d at 28)).

In Applied Industrial, the Second Circuit considered a petition to vacate on the basis of an arbitrator's nondisclosure. There, the arbitrator neither investigated what he knew to be a potential business relationship between his corporation and an arbitrating party, nor disclosed that he had "walled himself off" from it.  492 F.3d at 135.  The Applied Industrial Court concluded that: "An arbitrator who knows of a material relationship with a party and fails to disclose it meets Morelite's 'evident partiality' standard: A reasonable person would have to conclude that an arbitrator who failed to disclose under such circumstances was partial to one side."  Id. at 137.  While the court set out a prophylactic procedure an arbitrator "must" follow when he or she "has reason to believe that a nontrivial conflict of interest might exist,"[25] it emphasized that it was

> not creating a free-standing duty to investigate.  The
> mere failure to investigate is not, by itself,
> sufficient to vacate an arbitration award.  But, when an

---

[25]   "[W]here an arbitrator has reason to believe that a nontrivial conflict of interest might exist, he must (1) investigate the conflict . . . or (2) disclose his reasons for believing there might be a conflict and his intention not to investigate."  Id. at 138.

> arbitrator knows of a potential conflict, a failure to either investigate or disclose an intention not to investigate is indicative of evident partiality.

Id. at 138 (emphasis in original).  It follows that the materiality of the undisclosed conflict drives a finding of evident partiality, not the failure to disclose or investigate per se.  See Scandinavian Re, 668 F.3d at 77 ("The nondisclosure does not by itself constitute evident partiality.  The question is whether the facts that were not disclosed suggest a material conflict of interest." (emphasis in original)).

### 2.   The Timeliness of Schmidt's 2012 Disclosures

IRB contends that Schmidt's disclosure of his role in the Equitas arbitration was impermissibly untimely.  An obligation to "timely" or "continuously" disclose newly arising conflicts does not appear in the text of the FAA, in the parties' arbitration clauses, or in their umpire questionnaire.  However, IRB attempts to locate such an obligation in the caselaw and existing, but not contractually adopted, professional ethical guidelines.  This obligation, IRB contends, is "enforceable under the FAA independent of any contractual arrangement between the parties"; was breached by Schmidt in this case; and warrants vacatur on the grounds of evident partiality.  IRB Reply 9.  The Court rejects the premises of IRB's argument and its conclusion.

As a preliminary matter, we note that upon his initial nomination as an umpire candidate in 2009, Schmidt furnished the

parties with a thorough and accurate response to their umpire questionnaire. In that questionnaire, Schmidt disclosed extensive prior connections to the parties and their lawyers, including his participation in 25 past arbitrations involving the NICO affiliate Gen Re, 13 of those as Gen Re's party-arbitrator. In the more than five years since, IRB has never once objected to any of these past assignments. Instead, IRB focuses entirely on a single connection: Schmidt's role as Equitas's party-arbitrator in the Equitas arbitration. IRB's argument is that Schmidt's untimely disclosure of the Equitas assignment, taken alone, evidences partiality for NICO.

First, the proposition that Schmidt had, and breached, an obligation of "timely disclosure" in this context is unfounded in law. Each case IRB cites to support the purported obligation of timely disclosure is in fact a case of nondisclosure. See Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 146 (1968); Andros, 579 F.2d at 695-96, Schmitz v. Zilveti, 20 F.3d 1043, 1044 (9th Cir. 1994); Schwartzman v. Harlap, 377 F. App'x 108, 110 (2d Cir. 2010); Applied Industrial, 492 F.3d at 135; ANR Coal Co. v. Cogentrix of N.C., Inc., 173 F.3d 493, 496 (4th Cir. 1999); Sanko S.S. Co. v. Cook Indus., Inc., 495 F.2d 1260, 1262 (2d Cir. 1973). In each these cases, the allegedly partial arbitrator failed to disclosed a conflict -- one different in type from what he had already disclosed -- at any point before or during

the arbitration, and the conflict was discovered by the parties themselves after an award was issued.  This case is different. First, Schmidt's 2009 questionnaire response had already disclosed many connections similar in kind to the Equitas matter, without objection from the parties.  Second, Schmidt disclosed his participation in the Equitas arbitration voluntarily and rapidly after he was informed he had been selected as umpire in the NICO-IRB matter.  IRB objected, Schmidt ordered briefing, and he later published a written explanation of his decision not to withdraw.

Therefore, IRB is compelled to argue the narrow position that Schmidt's failure to disclose the Equitas assignment between March of 2011 (when he was first designated in the Equitas arbitration) and January of 2012 (when he was selected as umpire in the NICO-IRB arbitration and supplemented his disclosures sua sponte) constitutes evident partiality.  On this issue, the "nondisclosure cases" are inapposite.  And IRB has not cited, and the Court has not found, a case holding an arbitrator's voluntary disclosure of a potential conflict after his or her selection, rather than before, to be grounds for vacatur.  We believe that in the context of this case, the timing of Schmidt's supplemental disclosures was reasonable.  Schmidt's initial questionnaire response was met with two years of silence as the parties delayed, negotiated, and litigated.  On the day he learned he was selected as umpire, he promised to quickly update his disclosures, and did so two days

later, disclosing his assignment as party-arbitrator for Equitas subsequent to his 2009 questionnaire.  This course of conduct is sensible because, after submitting his initial questionnaire, Schmidt did not know when, or if, he would ever be selected as umpire.

IRB's conception of an obligation of "timely disclosure" for umpire candidates is actually one of "continuous disclosure," under which umpire candidates must immediately contact the participants in each arbitration in which they are an arbitrator or arbitrator candidate to disclose every potential new assignment.  This default rule would result in unreasonable burden. In this case, for example, Schmidt accepted 15 new assignments in the two years between being nominated and selected.  Presumably, he already had a roster of active and dormant cases, and was under consideration in still more.  A continuous pre-selection disclosure obligation as envisioned by IRB could easily add up to hundreds of supplemental disclosures, and failure to make any of them would be grounds to vacate any award ultimately issued. Confronted at oral argument with the question of whether it truly expected such blow-by-blow updates from Schmidt, IRB backed away from this position.  See Oral Arg. Tr. 6:5-8 ("No, I understand that's a good argument that he doesn't have to update.").

Moreover, IRB's position is more than tinged with irony given that, earlier in this litigation, IRB itself actively resisted

such disclosure.   A main issue in the parties' 2011 litigation before this Court was whether the umpire candidates in Arbitration 2 were required to submit responses to the parties' umpire questionnaire.   NICO had requested not only that Trutt complete the same questionnaire Schmidt did in 2009, but also that Schmidt update his disclosure to cover the intervening years.   IRB objected, insisting in its briefs and at oral argument that post-selection disclosure of potential conflicts was the norm.   See supra notes 8-9.   IRB could easily have obtained Schmidt's additional disclosure before the selection of umpire, either by acceding to NICO's request before or after our November 29 ruling, or asking the Court any time after.   Instead, through 2011, IRB flatly resisted any additional disclosure prior to selection of the umpire.

A further difficulty for IRB is that it never explains why the timing Schmidt's 2012 disclosure points specifically to bias in favor of NICO.   Schmidt had not only previously disclosed many such connections to known NICO affiliates in his 2009 questionnaire response (without objection from IRB), but also disclosed a new connection to IRB in his 2012 email: his December 2010 engagement by IRB's then-counsel as IRB's expert witness in another matter.   Therefore, even if Schmidt's 2012 disclosures were belated, IRB offers no reason why the belated disclosure of two additional

connections –– one to NICO, another to IRB –– would require a reasonable observer to conclude Schmidt was biased for NICO.

Finally, even if IRB were correct that Schmidt had, and breached, an obligation of "timely disclosure," vacatur would still not be appropriate.  It is not the nondisclosure itself but the materiality of the undisclosed facts that controls the evident partiality inquiry.  Scandinavian Re, 668 F.3d at 77.  We turn to that question next.

### 3.  Schmidt's Concurrent Service and Refusal to Withdraw

IRB argues that Schmidt's overlapping assignments as party-arbitrator in the Equitas matter and umpire in the NICO-IRB matter, and his refusal to withdraw as umpire in the NICO-IRB matter, constitute evident partiality under the FAA.  In particular, IRB claims Schmidt's appointment as party-arbitrator for Equitas in the Equitas arbitration made him "NICO's arbitrator" (IRB Reply Mem. 8) and a "hired gun" (Oral Arg. Tr. 31:25) with a "material commercial or financial relationship with NICO" (IRB Reply Mem. 8), rendering him evidently partial in the NICO-IRB matter.  IRB's position is unpersuasive.

### a)   The NICO-Equitas Relationship

A premise IRB relies on is that NICO and Equitas are the same or affiliated parties for the purpose of analyzing an arbitrator's conflicts of interest.  Equitas has a substantial financial relationship with NICO that appears to go beyond that of a mere

"reinsured" in the normal sense.  For example, in combination with other Berkshire subsidiaries, NICO appears to have control over some daily operations at Equitas such as the management of claims by Resolute, and NICO and Equitas shared the same counsel in the two arbitrations at issue.  At the same time, NICO and Equitas are separate companies with separate boards of directors, and NICO has no ownership interest in Equitas.

Because we conclude that this issue does not affect the outcome of the case, we will presume that NICO and Equitas are affiliates for the purposes of "evident partiality" analysis.  We emphasize, however, that the Equitas and NICO arbitrations at issue in this case are indisputably factually unrelated.

  b) <u>Payment as Party-Arbitrator and Overlapping Assignments</u>

IRB alleges that as party-arbitrator in the Equitas matter Schmidt:

> owed his retention to NICO; the case for which he was expected to advocate was developed by NICO and NICO's attorney Mr. Knoerzer; the financial interest he was hired to protect was NICO's; he was paid by NICO (or another Berkshire Hathaway entity such as Resolute); and any future work would come from NICO (or another Berkshire Hathaway entity such as Resolute).  This indisputably is evidence that Mr. Schmidt had a material or commercial financial relationship with NICO.

IRB Reply Mem. 8 (internal quotation marks omitted).  Thus, in addition to equating NICO and Equitas, IRB also suggests Schmidt's appointment and payment as party-arbitrator produced a material or

commercial financial relationship with NICO sufficient to constitute evident partiality in the NICO-IRB arbitration.

To address this claim, we begin with two general observations. First, quite unlike litigation in the courts, arbitration is a form of dispute resolution in which the parties select and pay their adjudicators. That IRB and NICO appreciated this fact is apparent from the selection and payment provisions in their arbitration clauses. Second, to the extent an arbitration clause (such as this one) requires arbitrators with specialized experience in a certain field, the available number of arbitrators will be limited,[26] and, relatedly, specialized arbitrators are more likely to have come into contact with the parties operating in their field. Such a tradeoff between expertise and past contacts with the parties has long been recognized. See Morelite, 748 F.2d at 83 ("Familiarity with a discipline often comes at the expense of complete impartiality. Some commercial fields are quite narrow,

---

[26]    At oral argument, we suggested that a search on the website of ARIAS-U.S. -- the American affiliate of the AIDA Reinsurance and Insurance Arbitration Society, which maintains a list of "ARIAS-U.S. Certified Umpires" (including Schmidt) -- based on the parameters in the parties' arbitration agreement yielded a list of 35 possible ARIAS-certified umpires. Oral Arg. Tr. 29:1-4; see ARIAS-U.S., Arbitrator, Umpire, and Mediator Search, https://www.arias-us.org/index.cfm?app=search (last visited Mar. 7, 2016). IRB objected in its letter of January 15, 2016, 15 Civ. 3975 (NRB), ECF No. 31, saying, first, that it believed the correct number of ARIAS-certified umpires meeting the requirements of the arbitration clause was 149, not 35; and second, that because there was no requirement for an ARIAS-certified umpire, there were more possible umpires available. We did not, and do not, rely on our informal research for any quantitative or other purpose. But we do stand by the commonsense proposition, supported by the cases cited here, that an arbitration clause demanding "active or retired officers of insurance or reinsurance companies" will substantially limit the universe of potential arbitrators.

and a given expert may be expected to have formed strong views on certain topics, published articles in the field and so forth. Moreover, specific areas tend to breed tightly knit professional communities. Key members are known to one another, and in fact may work with, or for, one another, from time to time."); Int'l Produce, Inc. v. A/S Rosshavet, 638 F.2d 548, 552 (2d Cir. 1981) ("The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose. Since they are chosen precisely because of their involvement in that community, some degree of overlapping representation and interest inevitably results."); Transportes Coal Sea de Venezuela C.A. v. SMT Shipmanagement & Transp. Ltd., No. 05-CV-9029 (KMK), 2007 A.M.C. 1363, 1366, 2007 WL 62715 (S.D.N.Y. Jan. 9, 2007) ("However, arbitrators, who are often chosen directly from the niche business communities whose disputes they are called upon to arbitrate, may have pre-existing relationships with one or both of the parties to an arbitration, or another arbitrator.").

A few important conclusions follow. First, it cannot be that selection and payment for a person's services as party-arbitrator or umpire, without more, produces a "material or commercial financial relationship" sufficient to constitute disqualifying partiality. If it did, the entire commercial arbitration system, which universally uses such procedures, would be undermined. It

43

follows, a fortiori, that payment as an arbitrator in a past matter is similarly insufficient to produce a conflict in a later matter. Second, specialized arbitrators are likely to know one another, and repeated or overlapping service by the same arbitrators in different arbitrations is bound to occur.  See Scandinavian Re, 668 F.3d at 74 n.20 ("Such overlapping service is not only not a circumstance inherently indicative of bias; it is also not unusual. In specialized fields such as reinsurance, where there are a limited number of experienced arbitrators, it is common for the same arbitrators to end up serving together frequently."); Dow Corning Corp. v. Safety Nat'l Cas. Corp., 335 F.3d 742, 750 (8th Cir. 2003) ("[T]he relatively small number of qualified arbitrators may make it common, if not inevitable, that parties will nominate the same arbitrators repeatedly."), cert. denied, 540 U.S. 1219 (2004).

IRB has not presented, and the Court has not found, any case in which a court has found an arbitrator's past service as an arbitrator to be a basis to vacate an arbitration award.[27]  Instead,

---

[27]   Additionally, though non-binding here, the Practical Guide to Reinsurance Arbitration Procedure promulgated by ARIAS-U.S. -- whose code of conduct the parties cite in their briefs -- supports this conclusion.  Specifically, the Guide exempts payment as an arbitrator or umpire from the type of remuneration that would render an arbitrator "under the control" of a party:

> Regardless of specific contract language, however, it is accepted practice that all arbitrators should be financially disinterested and not under any party's control, and that the umpire should be neutral. Examples of a "financial interest" include contingent fee arrangements, bonuses tied to a result, employment by another reinsurer or cedent on the same risk at issue, or a financial

IRB relies on cases in which evident partiality arose out of other types of relationships that are not present here. See Commonwealth Coatings, 393 U.S. at 146 (umpire had, over years, repeatedly accepted compensation directly from party for business services rendered); Applied Indus., 492 F.3d at 135 (2d Cir. 2007) (umpire's company transacting business with affiliate of arbitrating party during the arbitration); Morelite, 748 F.2d at 81 (father-son relationship between arbitrator and officer of international union of which arbitrating party was a local); Sun Refining & Mktg. Co. v. Statheros Shipping Corp., 761 F. Supp. 293, 295-96 (S.D.N.Y. 1991) (umpire a witness in separate arbitration between his employer and a party in the case he was arbitrating). The remaining cases IRB draws upon are ones in which no evident partiality was found. See Schwartzman, 377 F. App'x at 110 (no evident partiality when arbitrator failed to disclose that arbitrating party had hired him to provide kosher certification); ANR Coal, 173 F.3d 493 (no evident partiality when arbitrator

---

investment in a company that may be materially affected by the outcome of the proceedings. An arbitrator is "under the control" of a party when he or she is an employee, officer or director of that party or receives a consulting fee or other remuneration or compensation from that party other than as an arbitrator or umpire.

ARIAS-U.S., Practical Guide to Reinsurance Arbitration Procedure, Chapter II ¶ 2.3, cmt. A, https://www.arias-us.org/index.cfm?a=39 (last visited Mar. 7, 2016) (emphasis added).

Ironically, the only potentially disqualifying payment to Schmidt under this rule would be one made to him by IRB, for his services as an expert in another matter.

failed to disclose attenuated connections between his law firm and arbitrating party); Sanko S.S., 495 F.2d at 1265 (no finding of evident partiality, but case remanded for evidentiary hearing, when appellant claims presiding arbitrator failed to disclose his company's business dealings with successful arbitrating party and with that party's counsel).  In Andros, for example, the Second Circuit confirmed the arbitration award even though the neutral arbitrator had failed to disclose that he had served on 19 prior arbitration panels with the president of a company involved in the arbitration, and in 12 of those panels that president had been one of the arbitrators who had selected him as the neutral; evident partiality was absent because "the relationship between [them] was a professional one, growing out of their service as arbitrators. There was no 'business relationship' in the ordinary sense between them or between their employers."  579 F.2d at 701.

IRB does not allege that Schmidt had any familial, business or employment relationship with either NICO or Equitas, or that he had any financial interest in the outcome of either arbitration.[28] It is also notable that IRB never raised an objection based on

---

[28]   IRB suggests Schmidt's "bias and the resulting prejudice to IRB in the arbitration are manifest" based on his conduct in (1) responding to IRB's requests that he withdraw, and (2) his "slew of unfavorable and unfair rulings" with which IRB disagrees.  IRB Mem 31-35.  However, neither an arbitrator's disagreement with party's position, nor adverse rulings against a party, themselves indicate unfair bias.  Scandinavian Re, 668 F.3d at 75; Thomas C. Baer, Inc. v. Architectural & Ornamental Iron Workers Local Union No. 580, 813 F.2d 562, 565 (2d Cir. 1987).

Schmidt's participation in 25 prior arbitrations involving the NICO affiliate General Re, 13 of those times as General Re's party-arbitrator.  In fact, after learning of these 25 past assignments, IRB chose to strike a different NICO-nominated candidate for umpire in Arbitration 2.

It is unclear why Schmidt's 25 past involvements with NICO affiliates -- 13 as a NICO affiliate's party-arbitrator -- were acceptable to IRB, yet this 26th connection -- 14th as party-arbitrator "for" -- was not.  IRB attempts to distinguish the Equitas matter from the prior General Re matters based on: (1) the concurrent nature of the Equitas and NICO-IRB arbitrations; and (2) its view of the contrasting roles of party-arbitrator and umpire.[29]

IRB argues that a person concurrently serving as party-arbitrator and umpire in two arbitrations involving affiliated parties is inherently biased in favor of both the party appointing

---

[29]    IRB relies on cases stressing the importance of a neutral umpire.  See, e,g., Commonwealth Coatings, 393 U.S. at 147 ("These provisions [of the FAA] show a desire of Congress to provide not merely for any arbitration but for an impartial one.").  The neutrality of the umpire is in contrast to the expectation that, "in tripartite arbitrations such as this one, parties often expect the party-appointed arbitrators to serve as informal advocates for their respective parties in deliberating with the neutral third arbitrator."  Scandinavian Re, 668 F.3d at 76 n.21 (citing cases).  See also IRB-Brasil II, 2011 WL 5980661, at *4 ("It is commonly accepted that in the tripartite arbitration system, parties are entitled to an arbitrator of their choice to act as a de facto advocate for their position.").  But see Florasynth, Inc. v. Pickholz, 750 F.2d 171, 173 (2d Cir. 1984) (suggesting party-arbitrators are "not to act merely as partisan advocates").

him party-arbitrator[30] and the affiliated party for whom he is serving as umpire.  Although NICO claims Scandinavian Re settled this issue by permitting such overlapping assignments, IRB correctly responds that, in Scandinavian Re, but unlike here, the two arbitrators who served concurrently in another arbitration kept in role of umpire and party-arbitrator across the two matters.

It nevertheless remains unclear why the cross-role appointments in unrelated arbitrations constitute evident partiality in the second arbitration.  In particular, the Court sees no principled distinction between an umpire having served as a party-arbitrator for an affiliated party in a settled, or completed, or otherwise dormant arbitration appointment and doing so in two arbitrations pending simultaneously.[31]  The fact of overlapping service does not change that in each context, payment

---

[30]   The Scandinavian Re Court noted that "several of our sister circuits have concluded that the FAA imposes a heightened bar to, or altogether forecloses, an evident-partiality challenge premised solely on the alleged bias of a party-appointed arbitrator in favor of the party who appointed him." 668 F3d at 76 n.21 (citing cases).  Because this case involves Schmidt's participation as umpire, the meaning of "evident partiality" as applied to party-arbitrators is not at issue.

[31]   At oral argument, NICO represented that five the 13 matters in which Schmidt was appointed party-arbitrator by the NICO affiliate General Re were still active at the time his disclosed them on his 2009 questionnaire.  Oral Arg. Tr. 14:1-5.  If true, this would make IRB's challenge to only the Equitas appointment -- a sixth such overlapping appointment as party-arbitrator for an affiliated party -- even less persuasive.  However, IRB responds that the past-tense language of Schmidt's 2009 questionnaire instead suggests these matters ended with awards by the panels.  IRB Reply 16; Letter of January 15, 2016, at 2 n.2, 15 Civ. 3975 (NRB), ECF No. 31.  Neither party offers specific evidence to support its position.  The Court will presume that none of the prior Gen Re arbitrations were active in 2009, so that this disputed fact will not affect our analysis.

is for services as arbitrator, and is not tied to the result of either arbitration.   Nor are there present any of the types of biased relationships identified by the caselaw.   Moreover, whatever motivations may exist to obtain future appointments do not change because of the existence of simultaneous assignments on unrelated matters.   The one federal court to address an analogous set of facts head-on is in accord.   See Ario v. Cologne Reins. (Barbados), Ltd., No. 1:CV-98-0678, 2009 WL 3818626, at *10 (M.D. Pa. Nov. 13, 2009) ("We also conclude that there is no evident partiality from an arbitrator's accepting a position as an umpire in another, unrelated arbitration while the current arbitration is still ongoing, even if . . . one of the parties is an affiliate of a party to the current arbitration.").[32]

Moving from the abstract to the case before us, Schmidt's protestations in his February 25, 2012 email explaining his refusal to withdraw that he was not a "hired gun" was borne out by his vote in the Equitas matter: he ultimately voted against Equitas,

---

[32]   IRB relies on this Court's comment in IRB-Brasil I that, by selecting Rosen as its party-arbitrator in Arbitration 3, NICO could be considered to have struck him as an umpire candidate in Arbitration 2; similarly, by accepting the appointment, Rosen "has effectively removed himself from consideration as a neutral third arbitrator in Arbitration 2."  2011 WL 4686517, at *3.  IRB now argues that if Rosen could not simultaneously be party-arbitrator in Arbitration 3 and umpire in Arbitration 2, then Schmidt could not properly be party-arbitrator in the Equitas matter and umpire in the NICO-IRB matter.  While creative, IRB's argument is inapposite.  IRB-Brasil I involved two almost identical arbitrations between the exact same parties; IRB had requested consolidation of those two arbitrations; and they were ultimately consolidated. Nor was the Court's observation made in the same procedural context.

resulting in a large award to Equitas's adversary.[33]  See Decl. of Robert Lewin in Support of Pet. to Confirm Arbitr'n Award, Ex. O, at 13, Arrowood Indem. Co. v. Equitas Ins. Ltd., No. 13 Civ. 7680 (DLC) (S.D.N.Y. Oct. 30, 2013), ECF No. 5.   Schmidt has also accepted appointments as party-arbitrator "against" other NICO-reinsured parties whose claims are handled by Resolute.   Knoerzer Decl. Ex. 41, at 3.   Viewed in context, Schmidt's entire record could not lead a reasonable observer to believe Schmidt was a "hired gun" for Equitas or NICO.[34]

IRB's suggestion that Schmidt was motivated to favor NICO so that "future work would come from NICO," IRB Reply 8, is unpersuasive.   As noted earlier, considerations of future work are not limited to simultaneous arbitrations.   Even if it is assumed that Schmidt desired future umpire engagements from Equitas, NICO,

---

[33]   Schmidt reported that in March of 2015, he was appointed as Equitas's party-arbitrator in a second arbitration involving the same parties: both Equitas (represented this time by different counsel) and its adversary sought the same party-arbitrators as in the prior Equitas arbitration because the new matter might require an interpretation of the prior panel's decision.   Knoerzer Decl. Ex. 41, at 3.   As of May 2015, that arbitration was not active.   Id.

[34]   Although not advanced by IRB, another possible concern unique to overlapping umpire and party-arbitrator assignments for affiliated parties represented by the same counsel is the risk of ex parte communication regarding the umpire assignment while counsel reaches out to arrange the party-arbitrator assignment.   In this case, however, Schmidt confirmed there was no such ex parte communication, both in his 2012 supplemental disclosure and in his email explaining his reasons for not withdrawing.   IRB presents no contrary evidence.   See Scandinavian Re, 668 F.3d at 78 (addressing a similar argument).  Additionally, IRB's argument that because of the timing of his disclosure of the Equitas assignment, "Schmidt may have failed to disclose other conflicts," IRB Mem. 30–31, is pure speculation and particularly inappropriate under the facts of this case.   See United States v. Int'l Bhd. of Teamsters, 170 F.3d 136, 147 (2d Cir. 1999) (evident partiality "may not be based simply on speculation").

or their counsel, a reputation of bias would prove counterproductive to that endeavor. See Amerisure Mut. Ins. Co. v. Everest Reins. Co., 109 F. Supp. 3d 969, 989 (E.D. Mich. 2015) ("The selection of a neutral umpire often requires the consent of both parties (as it did here), and thus a neutral who earns a reputation as favoring insurers over reinsurers (or, indeed, a reputation of playing it any way other than 'straight down the middle') would quickly find himself with less work, not more."). See also Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 681 (7th Cir. 1983) (Posner, J.) (reasoning that neutral arbitrators' reputational concerns deter unethical conduct). Additionally, there is no evidence in the record suggesting that Schmidt even knew which party nominated him as an umpire candidate prior to IRB's accusations of bias in March of 2012.

The parties also debated in their briefs and at oral argument IRB's contention that Schmidt's simultaneous assignments violated certain professional ethical canons. This discussion is largely beside the point, and to the extent that it has relevance favors NICO. First, as IRB insisted and this Court agreed in the 2011 litigation, no professional ethical standard -- promulgated by ARIAS-U.S. or anyone else -- are contractually incorporated into this arbitration through the 2007 and 2008 Contracts' arbitration clauses. Thus, even a breach of those standards is not grounds for vacatur. See Scandinavian Re, 668 F.3d at 77 n.22 ("This is

51

not a case in which the parties have specified a standard for arbitrator impartiality. Accordingly, we need not decide whether noncompliance with such an agreed-upon standard would require a finding of 'evident partiality.'"). Second, even if the ARIAS standards were binding, NICO has made a persuasive showing that the ARIAS guidelines do not prohibit a party-arbitrator from accepting a simultaneous assignment as umpire in an unrelated arbitration involving the same party: it is instead a "factor" an arbitrator candidate "should consider" to determine if such an arrangement "would likely affect their judgment."[35] Here, Schmidt requested extensive briefing on the issue and wrote a reasoned decision. Thus, even if applicable, the ARIAS ethical standards leave the recusal decision to the arbitrator's reasoned discretion, and Schmidt's consideration of the issue is not impeachable. Third, IRB's resort to ethical standards of the profession is particularly ironic given the impressive array of

---

[35]     Canon I of the ARIAS-U.S. Code of Conduct states that: "Arbitrators should uphold the integrity of the arbitration process and conduct the proceedings diligently." Comments 3 and 4 to Canon I set out two separate lists: first, circumstances in which an arbitrator candidate "must refuse to serve," Canon I cmt. 3; and second, "factors" an arbitrator candidate "should consider" to determine if any of them "would likely affect their judgment, and, if so, should decline the appointment," Canon I cmt. 4. The factor applicable to this case -- "whether the candidate currently serves in a non-neutral role on a panel involving a party and is now being proposed for an umpire role in an arbitration involving the party," Canon I cmt. 4(b) -- appears on the list of what "should" be considered by the candidate, not what "must" prompt a refusal of the assignment. See Dodge Decl. Ex. OO, at 2-3, available at https://www.arias-us.org/index.cfm?a=27.    NICO is therefore correct that these ARIAS-U.S. provisions leave this particular question of simultaneous appointments to non-neutral and neutral arbitrator roles to the discretion of the arbitrator.

less than ethical conduct by IRB and its former counsel in this case that have gone undisputed.[36]

Ultimately, the Court concludes Schmidt's concurrent arbitration assignments do not approach the standard of partiality that a reasonable person would <u>have</u> to conclude he was partial to NICO.

### 4.   NICO's Alleged "Undue Means"

IRB raises an alternative argument: that the wrongful nondisclosure was that of NICO's counsel, who as counsel for Equitas knew of Schmidt's participation in the Equitas arbitration and failed to volunteer it either to IRB or this Court during the 2011 litigation.  IRB Mem. 35-37.  IRB urges that NICO's conduct constitutes: (1) a procurement of the awards by "undue means"; (2) a breach of the parties' contract, which incorporates an implicit duty of fairness; and (3) a breach of NICO's duty of candor to the Court.

Under section 10(a)(1) of the FAA, a court may vacate an arbitration award "where the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1).  The award "must stand unless it is made abundantly clear that it was obtained

---

[36]   Examples include: the efforts to conceal the "side deal"; the participation in ghost-writing White's "dissent" that IRB filed, and then withdrew, on the Court's docket; and IRB's apparent response to a ruling of the Panel regarding substitution of a witness located in Brazil one day before the ruling was first published to the parties.  <u>See</u> NICO Pet. ¶ 59 & n.11.  IRB makes no effort to dispute these alleged lapses.

through 'corruption, fraud, or undue means.'"   Karppinen v. Karl
Kiefer Mach. Co., 187 F.2d 32, 34 (2d Cir. 1951).   See Polin v.
Kellwood Co., 103 F. Supp. 2d 238, 256 (S.D.N.Y. 2000), aff'd, 34
F. App'x 406 (2d Cir. 2002).   We read "undue means" in this context
as conduct similar to the "fraud" and "corruption" also proscribed
in Section 10(a)(1).   See Nat'l Cas. Co. v. First State Ins. Grp.,
430 F.3d 492, 499 (1st Cir. 2005) ("The best reading of the term
'undue means' under the maxim noscitur a sociis is that it
describes underhanded or conniving ways of procuring an award that
are similar to corruption or fraud, but do not precisely constitute
either."); PaineWebber Grp., Inc. v. Zinsmeyer Trusts P'ship, 187
F.3d 988, 991 (8th Cir.1999) ("The term 'undue means' must be read
in conjunction with the words 'fraud' and 'corruption' that precede
it in the statute."); Am. Postal Workers Union, AFL-CIO v. U.S.
Postal Serv., 52 F.3d 359, 362 (D.C. Cir. 1995) ("Undue means"
refers to conduct by a party "equivalent in gravity to corruption
or fraud, such as a physical threat to an arbitrator or other
improper influence.").

> Although the Second Circuit has not yet articulated a
> test for vacating an award on this ground, courts in
> this district have found that the party challenging the
> award must show that "(1) [its] adversary engaged in
> fraudulent activity; (2) the petitioner could not, in
> the exercise of due diligence, have discovered the
> alleged fraud prior to the award; and (3) the alleged
> fraud materially related to an issue in the
> arbitration."

Salzman v. KCD Fin., Inc., No. 11 Civ. 5865 (DLC), 2011 WL 6778499,
at *3 (S.D.N.Y. Dec. 21, 2011) (brackets in original) (quoting
McCarthy v. Smith Barney Inc., 58 F. Supp. 2d 288, 293 (S.D.N.Y.
1999)).

The Court is not persuaded that NICO's failure to volunteer
Schmidt's participation in the Equitas matter is a basis to vacate
the Panel's arbitration awards.  First, as noted earlier, the lack
of earlier disclosure is the result of IRB's own position in
earlier litigation, specifically, its resistance to NICO's 2011
request that both umpire candidates submit up-to-date
questionnaires.  IRB had ample opportunity to learn about the
Equitas matter sooner, but chose not to.  Second, IRB's argument
is advanced without any evidence of deceptive conduct by NICO,
such as an affirmative misrepresentation to either IRB or this
Court regarding Attorney Knoerzer's relationship with Schmidt or
Schmidt's past service as an arbitrator.  IRB's claims are also
made without the benefit of any case authority suggesting that
conduct like NICO's in this case breaches of the implied duties of
good faith and candor to the Court or warrants vacatur of an
arbitration award.  Moreover, the Court notes that, in 2011, IRB
had its own new connection to Schmidt: it had engaged Schmidt as
an expert witness in another case, a fact IRB felt no need to
disclose to NICO or the Court sua sponte.  For these reasons, there
is no basis to conclude that NICO procured the awards through undue

means, deception of the Court, or a breach of the implied duty of good faith.

## C.    The Panel's Jurisdiction

IRB's second argument is that the Panel's second and third awards must be vacated because the Panel lacked the power to issue them.  This argument also lacks merit.

### 1.    Governing Law

Under the FAA, a court may vacate an arbitration award when "the arbitrators exceeded their powers," 9 U.S.C. § 10(a)(4), or modify the award when "the arbitrators have awarded upon a matter not submitted to them," 9 U.S.C. § 11(b).  A party raises a question of arbitrability when he or she asserts that the arbitral award should not be enforced because there was no effective agreement to arbitrate the dispute.  Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 406 (2d Cir. 2009).

A court's review of questions of arbitrability is "subject to two important presumptions." Id.  First, "'any doubts concerning the scope of arbitrable issues' [must] be resolved in favor of arbitration."  Id. (quoting Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir. 2003)).  Second, "arbitrability questions are presumptively to be decided by the courts, not the arbitrators themselves."  Id.  Yet "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed

serious error does not suffice to overturn his decision." <u>United Paperworkers Int'l Union v. Misco, Inc.</u>, 484 U.S. 29, 38 (1987).

> **2.   Analysis of the Panel's Second and Third Awards**
>
>> a)   <u>Arbitrability of the 2008 Premium</u>

IRB first contends that the parties never agreed to arbitrate the issue of the 2008 Premium.  This claim is unsupported by the facts.  First, IRB knew the 2008 Contract was implicated in this arbitration from the start.  NICO's demand for Arbitration 2 -- which was consolidated with Arbitration 3 to constitute the subject matter of the arbitration conducted in this case -- sought relief under the 2008 Contract and was made pursuant to the arbitration clause in the 2008 Contract.  <u>See</u> Dodge Decl. Ex. F.  NICO sensibly demanded arbitration under both the 2007 and 2008 Contracts because it was initially informed that the date of loss was "TBA."  As a result, NICO did not know whether the CSN loss would ultimately fall under the Extension Period, the Renewal Period, both, or neither.  Thus, IRB was clearly on notice that the 2008 Contract was at issue as early as NICO's December 2008 demand for arbitration under that contract.

IRB argues that there was no agreement to arbitrate the 2008 Premium issue specifically, and that the particular issue of the 2008 Premium was brought up too late in the arbitration process.  However, the 2008 Premium was part of the 2008 Contract, which contained an arbitration clause covering "any dispute . . . with

reference to the interpretation of this Insurance or rights with respect to any transaction involved." IRB does not explain why the Panel acceding to NICO's request that it address the 2008 Premium would require a separate agreement to arbitrate. Moreover, NICO raised the specific 2008 Premium issue soon after the "secret side deal" came to light in discovery (a new development that first put NICO's 2008 Premium at risk) and IRB did not timely object. In its pre-hearing brief of October 2014, NICO specifically sought rulings that NICO had reinsured IRB pursuant to the 2008 Contract, that it was entitled to keep the 2008 Premium, and that IRB must indemnify NICO in the event CSN asserted claims in connection with the 2008 Contract.[37] See Knoerzer Decl. Ex. 27, at 80. Notably, IRB did not object to the arbitrability of either the 2008 Contract or the 2008 Premium at any time before or during the arbitration hearing. Instead, it first raised its arbitrability argument in January of 2015, one week after the Panel's initial ruling in favor of NICO.

Finally, IRB contends that the 2008 Contract itself is invalid, based on what it believes to be the Panel's incorrect conclusion that Catalyst Re was IRB's agent in arranging the 2008 Contract. This position is belied by (1) IRB's extensive history

---

[37]    IRB responds that NICO's early demands for relief under the 2008 Contract with respect to the 2008 Premium were merely pro forma requests. IRB Mem. 42. This argument is frivolous. A claim for relief listed as one of five numbered requests in the "conclusion" section of a brief is more than sufficient to provide a party notice of an issue.

of admitting the existence of the 2008 Contract prior to disavowing it in its "side deal" with CSN, see supra notes 15–18;[38] and (2) IRB's failure to object at any time between 2008 and 2015 to the validity of the 2008 Contract or the Panel's jurisdiction over it.[39] Based on these facts, and in light of the presumption in favor of arbitrability, the Court concludes that the 2008 Contract and the accompanying 2008 Premium were properly the subject of the arbitration.

### b)  The Panel's Alleged Functus Officio Status

IRB levels a second challenge to the validity of the Panel's second and third awards: it argues that the Panel relinquished jurisdiction as of January 22, 2015, based on its statement in its first award of January 15, 2015, that "[i]f by January 22, 2015 there is no joint request, or if a request of any kind is made by that date and the panel does not decide to act on it, the panel's

---

[38]    IRB made similar admissions in the 2011 litigation.  For example, in its petition requesting consolidation of NICO's arbitration demands, IRB wrote:

> 15. In renewing the Extension, NICO issued a facultative reinsurance policy to IRB bearing policy number 90SRD102385 for the period of February 21, 2008 to February 21, 2009, referred to as the "Renewal".

> 16. The back-to-back reinsurance contracts of the Extension and the Renewal provided IRB with reinsurance coverage for alleged losses sustained by CSN at its plants and port facilities in Brazil.

Pet. of IRB-Brasil Resseguros S.A.'s to Stay, Disqualify and to Compel Comprehensive Consolidated Arbitration ¶¶ 15–16, IRB-Brasil, No. 11 Civ. 1965 (NRB) (S.D.N.Y. Mar. 21, 2011), ECF No. 1.

[39]    There is also the following mystery: if NICO did not reinsure IRB for the Renewal Period under the 2008 Contract, why was it paid the 2008 Premium of over $9 million?

jurisdiction regarding the 2008 renewal period shall end on January 22, 2015 without further notice."

IRB parses the Panel's statement to argue it meant that the Panel would relinquish jurisdiction unless its decision to act on a request was made by January 22. NICO reads the statement more broadly, inferring that the Panel was setting a deadline for requests, not its own decision to act. Therefore, the parties' submissions of January 22 -- NICO's brief requesting relief under the 2008 Contract and IRB's letter stating that the panel lacked jurisdiction and requesting leave to brief the merits in the alternative -- and the Panel's subsequent decision to act on those submissions suspended the termination of the Panel's jurisdiction.

The Court finds NICO's reading of the Panel's statement to be more reasonable, particularly in light of the presumption in favor of arbitrability. We also note that, of course, the Panel's second and third awards, issued in April and May of 2015 and addressed in part to the 2008 Renewal Period, indicate the Panel itself did not believe it had relinquished jurisdiction over the issue in January. Moreover, the record contains multiple indications that, contrary to its assertions today, IRB previously did not treat the Panel's January 15 award as its final decision; instead, it reported to this Court that other important issues remained

outstanding.[40]   For these reasons, the Court concludes the Panel was empowered to rule on the 2008 Premium issue and the fees and costs issue in April and May of 2015.

## IV.   CONFIRMATION OF THE AWARD

Because IRB has failed to establish grounds for vacating or modifying the awards, we "must" grant NICO's petition to confirm the arbitration awards.   9 U.S.C. § 9.

## V.   CONCLUSION

For the foregoing reasons, NICO's consolidated petition to confirm the arbitration Panel's three awards is granted, and IRB's cross-petition to vacate the awards is denied.   The Clerk of the Court is directed to terminate the motions pending at docket numbers 15, 16, and 19 and to close this case.

In addition, because the three related actions (15 Civ. 1165 (NRB), 15 Civ. 2939 (NRB), and 15 Civ. 3310 (NRB)) are duplicative

---

[40]   For example, IRB previously argued that NICO's initial petition to confirm the January 2015 award was premature because the Panel had not yet decided the 2008 Premium issue, and therefore had not yet issued a final award.   IRB's Mot. to Dismiss at 20-21, 15 Civ. 1165 (NRB), ECF No. 30; Compl. ¶ 35, 15 Civ. 2939 (NRB), ECF No. 1 ("The [January 2015 ruling], however, did not address all the issues in the arbitration and the Panel did not and has not issued a final award.   Indeed, the Decision specifically stated that there remained other issues outstanding   . . . that the Panel would address at a later date.") Furthermore, the timing of the "dissent" in April of 2015, which IRB helped to write, indicates IRB did not believe the panel's jurisdiction had ended in January.

of this one, the Clerk is directed to close those cases and to terminate the pending motions therein.

Dated:    New York, New York
          March  *10* , 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE